PRECEDENTIAL
UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 16-4011
_____

MARATHON PETROLEUM CORPORATION;
SPEEDWAY LLC; MARATHON PREPAID CARD LLC;
SPEEDWAY PREPAID CARD LLC,
                                        Appellants

v.

SECRETARY OF FINANCE FOR THE STATE OF
DELAWARE; STATE ESCHEATOR OF THE STATE OF
DELAWARE; AUDIT MANAGER FOR THE STATE OF
DELAWARE
_____

On Appeal from the United States District Court
for the District of Delaware
(D.C. No. 1-16-cv-00080)
District Judge:  Hon. Leonard P. Stark
_____

Argued
June 15, 2017

Before:  CHAGARES, JORDAN, and KRAUSE, *Circuit
Judges.*

(Opinion Filed: December 4, 2017)
_____

Diane Green-Kelly, Esq.  [ARGUED]
Reed Smith
10 South Wacker Drive
40th Floor
Chicago, IL  60606

R. Eric Hutz, Esq.
Reed Smith
1201 Market Street
Suite 1500
Wilmington, DE   19801
        *Counsel for Appellants*

Marc S. Cohen, Esq.
Loeb & Loeb
10100 Santa Monica Boulevard
Suite 2200
Los Angeles, CA   90067

Jennifer R. Noel, Esq.
Caroline L. Cross, Esq.
Delaware Department of Justice
820 N. French Street
Carvel Office Building
Wilmington, DE   19801

Steven S. Rosenthal, Esq.   [ARGUED]
Tiffany R. Moseley, Esq.
John D. Taliaferro, Esq.
Loeb & Loeb

901 New York Avenue, N.W.
Suite 300 East
Washington, DC   20001
    *Counsel for Appellees*

Jameel S. Turner, Esq.
Bailey Cavalieri
10 West Broad Street
Suite 2100
Columbus, OH   43215
    *Counsel for Amicus Curiae*

_____

OPINION OF THE COURT
_____

JORDAN, *Circuit Judge*.

Whether or not money makes the world go around, it is certainly the motive force in this case.  Two Delaware business entities, Marathon Petroleum Corporation ("Marathon") and Speedway LLC ("Speedway") (collectively "the Companies"), may have a particular pot of money that the State of Delaware wants to take.  The companies are naturally not eager to assist the State in that effort.  They challenge Delaware's right to conduct an audit examining whether certain funds paid for stored-value gift cards issued by their Ohio-based subsidiaries (the "Ohio Subsidiaries") are held by Marathon and Speedway and thus subject to escheatment.  Their argument relies on Supreme Court precedent that lays out a strict order of priority among states competing to escheat abandoned property.  Constructed as federal common law, that order of priority gives first place to

the state where the property owner was last known to reside. If that residence cannot be identified or if that state has disclaimed its interest in escheating the property, second in line for the opportunity to escheat is the state where the holder of the abandoned property is incorporated. Any other state is preempted by federal common law from escheating the property. In this case, money left unclaimed by owners of the stored-value gift cards is – at least according to Marathon and Speedway – held by the Ohio Subsidiaries, and Delaware can have no legitimate escheatment claim on the property. Marathon and Speedway have therefore filed suit and argue that, under the rules of priority and preemption laid down by the Supreme Court, Delaware is not permitted to escheat the gift-card money. Therefore, the argument goes, the State must also be barred from auditing Marathon and Speedway in connection with the gift cards.

Delaware responds that the Companies' preemption claim is not ripe because no action has been taken to enforce compliance with the audit and thus participation in the audit has been and still is voluntary. The District Court ruled that the dispute is ripe because Marathon and Speedway challenge Delaware's authority to conduct the audit at all. But the Court also concluded that private parties, such as the Companies here, cannot invoke the escheatment priority and preemption rules laid down by the Supreme Court, so it dismissed the Companies' suit.

The District Court treated this case with due care and admirable skill but, in the end, we disagree with its conclusion that private parties cannot invoke federal common law to challenge a state's authority to escheat property. We also have a somewhat different approach to the question of

4

ripeness. We see two ways to construe Marathon's and Speedway's arguments. Viewed one way, their claim is ripe; viewed the other, it is not. More specifically, to the extent the Companies are challenging Delaware's authority to initiate an audit in the first instance, the claim is ripe but wrong. The notion that the State cannot conduct any inquiry into abandoned property to verify a Delaware corporation's representations regarding abandoned property lacks merit. But, to the extent the Companies are challenging the scope or means of the examination in this case, the claim is not ripe, since the State has taken no formal steps to compel compliance with the audit. Either way, the preemption claim was rightly subject to dismissal.[1] Nevertheless, we will vacate the order of dismissal so that the District Court can clarify that dismissal is without prejudice, which may allow Marathon and Speedway to bring their claim again at a later date, if appropriate.

---

[1] Marathon and Speedway narrowly argued that *Texas v. New Jersey*, 379 U.S. 674 (1965), and its progeny foreclose a state's ability to examine whether a corporation has committed fraud such that property held by its out-of-state subsidiaries may be escheated. They did not clearly argue in the alternative that there is a point at which an otherwise legitimate state inquiry into the bona fides of a subsidiary triggers the priority rules, nor did they develop the factual record necessary to assess the merits of such an argument such as might have been available had there been an enforcement proceeding.

## I.   BACKGROUND[2]

### A.   Marathon and Speedway

Marathon and Speedway are Delaware corporations with their principal places of business in Ohio.  Marathon refines, markets, retails, and transports petroleum, and also sells its gasoline through independently owned gas stations located in the Midwest and Southeast.  Speedway is an indirect subsidiary of Marathon and operates gas stations and convenience stores.[3]  "[D]uring the audit period[,]" all of Speedway's stations "were outside of Delaware."[4]  (Opening Br. at 7.)  The Ohio Subsidiaries are Marathon Prepaid Card

---

[2] The District Court granted Delaware's motion to dismiss.  Accordingly, on appeal we "must accept all of the complaint's well pleaded facts as true[.]"  *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009).

[3] The exact corporate structure is complicated and not entirely clear from the record before us.  The Companies are (or were during the audit period) subsidiaries of Marathon Oil Corporation.  Marathon Petroleum Corporation (the "Marathon" that is the party here) was organized in 2009 as a direct subsidiary of Marathon Oil Corporation, but in 2011 it was spun off and became a separate, publicly traded corporation.

[4] That may have changed, but, for purposes of the relevant audit period under review, it is enough that Speedway did not have any stations in Delaware when this case was first filed.

LLC and Speedway Prepaid Card LLC. Their primary purpose is to issue non-expiring stored-value gift cards for their respective brands. According to the contracts between, on the one hand, Marathon and Speedway and, on the other, the Ohio Subsidiaries, the latter are "solely liable and obligated for the value of all [c]ards" that they issue. (App. at 217, 246.) Neither of the Ohio Subsidiaries obtain addresses of gift card purchasers or recipients, and both "conducted business solely outside of Delaware during the audit period."[5] (Opening Br. at 8.)

## B. The State Escheator

Like the law of other states, Delaware law presumes the right of the State to lay claim to abandoned property. Carrying into the present the language of feudal property concepts, the exercise of that power is called "escheatment." Del. Code Ann. tit. 12, §§ 1101 – 1224 (2017); *see also Escheat*, Black's Law Dictionary (10th ed. 2014) (observing that, in escheatment, "the state steps in the place of the feudal lord, by virtue of its sovereignty, as the original and ultimate proprietor of all the lands within its jurisdiction"). Delaware requires corporations organized under its laws to report and transfer to the State any property that has not been claimed by the property owners for five years. *Id.* § 1133(14).[6] To

---

[5] As far as we know, that is still the case.

[6] In February of this year, Delaware revamped its escheat statute. The General Assembly recognized that, "for ease of administration and organizational clarity, existing subchapters should be struck in their entirety and the statute restructured in a more orderly manner[.]" S.B. 13, 149th

7

enforce that requirement, it has created the office of State Escheator under the Department of Finance. *Id.* § 1102. The Escheator is permitted, "at reasonable times and on reasonable notice, … [to] [e]xamine the records of [a corporation] … in order to determine whether the [corporation has] complied with" the abandoned property laws. *Id.* § 1171. The Escheator has the authority to "[i]ssue an administrative subpoena to require that the records … be made available for examination," and may, if necessary, go to the Court of Chancery to enforce the subpoena.[7] *Id.* If the Escheator determines that a holder of abandoned property has underreported its holdings, the Escheator "shall mail [to the holder] a statement of findings and request for payment," the payment amount being the value of the property in question. *Id.* § 1179.

---

Gen. Assemb. (Del. 2017). In enacting "significant changes to the State's unclaimed property law[,]" *id.* at Synopsis, the legislature decided to limit the look-back period of all audits to ten years and to impose a ten-year statute of limitations. *Id.* The new law also creates a process for companies under audit prior to July 22, 2015, which would include the parties in this case, to either seek an expedited audit review process or participate in a voluntary disclosure program. *Id*. We are relying in this opinion on the amended version of the law, which is now in effect, and will note changes when relevant.

[7] Before the 2017 amendments, it was not clear whether the Escheator had the authority to subpoena records. The recent statutory changes make that power explicit. *Id.* § 1171.

8

The Escheator is permitted to rely on third party auditors to conduct an audit, and the vast majority of Delaware's audits are in fact farmed out to an entity called Kelmar Associates, LLC. Kelmar has a financial incentive to classify property as escheatable because it is compensated, at least in part, based on the value of property that Delaware is able to escheat.[8]

An abandoned property holder receiving the Escheator's request for payment may then choose among the following options: (1) pay the amount demanded; (2) pay and then seek a refund by filing an action in the Delaware Court of Chancery; or (3) refuse to pay and file an action in that same court. *Id.* The Court of Chancery reviews the Escheator's factual determination deferentially, taking "due account of the experience and specialized competence of the State Escheator," and the court will uphold the Escheator's determination if it was "the product of an orderly and logical deductive process rationally supported by substantial, competent evidence on the hearing record." *Id.* § 1179(d). Legal questions related to any such dispute are reviewed *de novo*. *Id.*

### C.     The Audit

On March 31, 2007, the Escheator, through Kelmar, commenced an examination of Marathon and Speedway. At

---

[8] We recently concluded that a corporation being audited by Kelmar had standing to bring a due process challenge based on the allegation that Kelmar had conflicts of interest. *Plains All Am. Pipeline LLC v. Cook*, 866 F.3d 534, 537 (3d Cir. 2017).

first, the audit concerned uncashed checks and payroll disbursement accounts. Also under audit were paper gift certificates issued by Speedway, which are different from the stored-value gift cards at issue in this appeal. Kelmar requested 35 years of "voluminous detailed financial records[.]" (App. at 7.) The Companies produced the requested documents. Kelmar then "requested additional detailed information several separate times[.]" (App. at 44.) In late 2012, more than five years into the audit process, Kelmar issued an Interim Status Report estimating liability of over $8 million for unredeemed gift certificates issued by Speedway from 1986 through 2000. Speedway produced documents drawing Kelmar's estimates into question, but Kelmar still issued a Report of Examination, concluding that Speedway owed that amount. Speedway protested the estimated liability and challenged the methodology used to arrive at it. Kelmar then requested "even more information related to the gift certificate program," and Speedway complied. (App. at 45.)

Another three years passed and, in April 2015, Kelmar expanded its audit to include the stored-value gift cards at issue now, requesting "extensive detailed information" about the Ohio Subsidiaries. (App. at 7.) Marathon and Speedway responded by arguing that, since the Ohio Subsidiaries were Ohio corporations, Delaware lacked authority to escheat any sums associated with the unredeemed gift cards. After having produced a selection of documents (including the governing contracts, articles of incorporation for the Ohio Subsidiaries, and W-2 forms for Speedway's Ohio Subsidiary) to prove that the Ohio Subsidiaries were incorporated in Ohio and had no property in Delaware, the Companies objected to producing any further information. Nevertheless, in October

2015, Kelmar sent a letter demanding further documentation. The Companies' counsel then sent a letter to the State Escheator objecting to the requests and repeating the argument that Delaware lacked jurisdiction to inquire further. At the beginning of 2016, Kelmar sent another letter to Marathon and Speedway, this time threatening that "continued failure to provide the requested information will result in the Office referring the matter to the Attorney General's Office for consideration of enforcement action." (App. at 48.)

### D. The Lawsuit

Marathon and Speedway responded by filing a complaint in the District Court, seeking declaratory and injunctive relief. They alleged that "any action by [the State] to enforce the request for documents is unlawful" because Delaware's escheat law "violates and is preempted by the federal common law … by authorizing the State Escheator to claim purported unclaimed property that Delaware lacks standing to claim under federal law." (App. at 34.) The Companies also asserted that the document requests constituted an unreasonable search in violation of the Fourth Amendment.

Delaware filed a motion to dismiss for failure to state a claim, which the District Court granted, though it rejected Delaware's argument that the case was not ripe. The Court held instead that the interests of the parties were adverse and that a judgment would be conclusive and of practical utility to the parties. More particularly, it noted that, even though Marathon and Speedway were "not currently the subject of an enforcement action, the aggressive and persistent nature of

11

[the] audit, in conjunction with [the] letter threatening referral to the Attorney General," placed them in the difficult position of facing a lengthy audit or the risk of large penalties. (App. at 13.) The Court acknowledged "the real and detrimental effects of the audit process" and the impact of continued uncertainty. (App. at 14-15.) It also noted that a decision would be conclusive because Marathon and Speedway were challenging the legal authority of the State to conduct any audit at all into the gift cards. Finally, the Court said that a decision would be of substantial utility because it would either stop the audit or pave the way for a battle over the scope of Delaware's requests.

Turning to the merits of the preemption claim, the District Court concluded that the rules governing priority to escheat unclaimed property applied only to conflicting claims between states and not to disputes between a private party and a state. Therefore, the preemption claim failed. The Court also dismissed the Companies' Fourth Amendment claim because there had been no compulsion to cooperate with the audit. Marathon and Speedway have filed this timely appeal, challenging only the dismissal of their preemption claim.

## II.  DISCUSSION[9]

This case poses several intertwined questions concerning Delaware's power to search for revenue by auditing companies and escheating abandoned property. The first, is whether, under the Supreme Court's rules of priority, private parties have standing to challenge a state's authority to conduct such an audit and escheat abandoned property. We conclude that they do. The second question is whether Marathon's and Speedway's challenge to Delaware's authority to conduct an audit is ripe, even though there has been no formal effort to compel cooperation. We conclude that the challenge to the authority to audit is ripe but that any challenge to the scope of this specific audit is not. Finally, we consider the merits of the one ripe dispute: whether, consistent with federal common law, Delaware can conduct

---

[9] Standing and ripeness are issues in this case, so our jurisdiction is in dispute. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003) (noting that ripeness "is drawn" at least in part "from Article III limitations on judicial power" (internal quotation marks omitted)); *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992) (emphasizing that "the core component of standing is an essential and unchanging part of the case-or-controversy requirement of Article III"). But, assuming that Marathon and Speedway have standing and that their claims are ripe, the District Court had jurisdiction under 28 U.S.C. § 1331. Our jurisdiction is then predicated on 28 U.S.C. § 1291. We review *de novo* the District Court's determination of jurisdiction, as well as its decision to grant Delaware's motion to dismiss for failure to state a claim. *Ballentine v. United States*, 486 F.3d 806, 808 (3d Cir. 2007).

an audit to determine whether abandoned property ostensibly held by Marathon's and Speedway's Ohio Subsidiaries is escheatable in Delaware. Before we delve into any of those issues, however, we begin with an overview of the governing precedent concerning a state's authority to escheat abandoned property.

### A.     Escheat Priority and Preemption

Every state and the District of Columbia has a set of escheat laws, under which holders of abandoned property must turn such property over to the State "to provide for the safekeeping of abandoned property and then to reunite the abandoned property with its owner." *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 383 (3d Cir. 2012). But, "in recent years, state escheat laws have come under assault for being exploited to raise revenue rather than" to safeguard abandoned property for the benefit of its owners. *Plains All Am. Pipeline L.P. v. Cook*, 866 F.3d 534, 536 (3d Cir. 2017). Two Justices of the United States Supreme Court recently noted their concern that states are "doing less and less to meet their constitutional obligation to" reunite property owners with their property before seeking escheatment, even as they more aggressively go about classifying property as abandoned. *Taylor v. Yee*, 136 S. Ct. 929, 930 (2016) (Alito, J., joined by Thomas, J., concurring in the denial of certiorari) (discussing a challenge to California's procedure for notifying property owners). Delaware is "no exception[,] as unclaimed property has become Delaware's

third-largest source of revenue[.]" [10]  *Plains All Am. Pipeline*, 866 F.3d at 536.

Whether a state can properly escheat property is therefore often a high-stakes question.  "With respect to tangible property, real or personal, it has always been the unquestioned rule in all jurisdictions that only the State in which the property is located may escheat."  *Texas v. New Jersey*, 379 U.S. 674, 677 (1965).  Intangible property, by comparison, presents a challenge because it cannot "be located on a map."  *Id.*  Therefore, without clear rules governing which state is entitled to escheat abandoned intangible property, like a right to access funds through a gift card, states could – and often have – come into conflict. When that occurs, those who hold apparently abandoned property may be at risk of facing competing escheatment claims to that property, an obviously troubling proposition. *See W. Union Tel. Co. v. Pennsylvania*, 368 U.S. 71, 75 (1961) (explaining that "the holder of … property is deprived of due process of law if he is compelled to relinquish it without assurance that he will not be held liable again in another jurisdiction").  In response to those concerns, the Supreme Court, in a set of cases that we will call for convenience the "*Texas* trilogy" or the "*Texas* cases," laid down the rules of priority governing the escheatment of intangible property.

---

[10] In fact, it has been pointed out that Delaware in particular "rel[ies] on decidedly old-fashioned methods [for providing notice of escheatment, methods] that are unlikely to be effective."  *Taylor v. Yee*, 136 S. Ct. 929, 930 (2016) (Alito, J., concurring).

## 1. The *Texas* Trilogy

In *Texas v. New Jersey*, the Supreme Court took up the question of which among several competing states was entitled to escheat abandoned intangible property. 379 U.S. at 677. At least four states wanted the money that backed uncashed checks held by the Sun Oil Company. *Id.* at 675-77. Sun Oil, now widely known as Sunoco, was incorporated in New Jersey and had its principal offices and place of business in Pennsylvania. *Id.* at 676. Many of the people to whom the checks were issued were in Texas while others were in Florida or in parts unknown. *Id.* at 675-77. Texas sued New Jersey, Pennsylvania, and Sunoco, and Florida moved to intervene. *Id.* All four states sought to escheat some or all of the money in question. *Id.* at 676-77.

The Supreme Court considered several possible rules to govern the order of priority among the states. *Id.* at 678. It emphasized the importance of adopting bright line rules rather than a test that would require case-by-case analysis.[11] *Id.* at 679-80. Using the terms "debtor" and "creditor" to designate, respectively, the "holder" and the "owner" of

---

[11] The Court rejected the proposal to apply the "most significant contacts" test because applying that test "would serve only to leave in permanent turmoil a question which should be settled once and for all by a clear rule which will govern all types of intangible obligations like these and to which all [s]tates may refer with confidence." *Texas*, 379 U.S. at 678. For similar reasons, the Court rejected use of the debtor's (i.e., the property holder's) principal place of business. *Id.* at 680.

unclaimed property,[12] the Supreme Court granted first priority to the state of the last known address of the creditor, according to the debtor's books and records. *Id.* at 680-82. The Supreme Court emphasized that such a rule was fair because "a debt is property of the creditor, not of the debtor[.]" *Id.* at 680. Moreover, such a rule would involve factual questions that are "simple and easy to resolve." *Id.* at 681. And the rule would "tend to distribute escheats among the [s]tates in the proportion of the commercial activities of their residents …, rather than technical legal concepts of residence and domicile[.]" *Id.*

Having determined which state had first priority, the Supreme Court then considered which state should have priority when there is no record of any address for the creditor, or when the "last known address is in a [s]tate which does not provide for escheat of the property owed[.]" *Id.* at 682. The Court concluded that in such cases the state of the debtor's state of incorporation would be entitled to escheat the property. *Id.* at 683. The Court acknowledged that the "case could have been resolved otherwise." *Id.* But it emphasized that "the rule [it] adopt[ed] is the fairest, is easy to apply, and in the long run will be the most generally acceptable to all the [s]tates." *Id.*

In *Pennsylvania v. New York*, 407 U.S. 206 (1972), the Supreme Court considered in greater detail the situation in

---

[12] In the context of escheat, the holder of unclaimed property such as the money owed to the bearer of an uncashed check or a gift card is called a "debtor," while the owner of the check or gift card is called a "creditor" because he is entitled to the money on demand.

which there is no record of the creditors' addresses. Pennsylvania sought to escheat unclaimed funds from money orders purchased within the state, and, naturally, it argued that "the [s]tate where the money orders are bought should be presumed to be the [s]tate of the sender's residence." *Id.* at 209, 212. The Court acknowledged that "Pennsylvania's proposal has some surface appeal." *Id.* at 214. Notwithstanding that appeal, however, the Court said that not knowing where many of the creditors lived did not justify a departure from the rule laid down in *Texas*: "[T]o vary the application of the *Texas* rule according to the adequacy of the debtor's records would require [us] to do precisely what we said should be avoided—that is, 'to decide each escheat case on the basis of its particular facts or to devise new rules of law to apply to ever-developing new categories of facts.'" *Id.* at 215 (quoting *Texas*, 379 U.S. at 679).

Finally, in *Delaware v. New York*, 507 U.S. 490 (1993), the Court rejected any efforts to loosen or change the priority rules by broadening the concept of a property-holding "debtor," *id.* at 502, or by allowing the state of the debtor's principal place of business to escheat the property, *id.* at 506. The Court succinctly summarized the priority rules from *Texas* in three steps. First, one must "determine the precise debtor-creditor relationship as defined by the law that creates the property at issue." *Id.* at 499. "Second … the primary rule gives the first opportunity to escheat to the state of 'the creditor's last known address as shown by the debtor's books and records.'" *Id.* at 499-500 (quoting *Texas*, 379 U.S. at 680-81). "Finally, if the primary rule fails because the debtor's records disclose no address for a creditor or because the creditor's last known address is in a [s]tate whose laws do not provide for escheat, the secondary rule awards the right to

18

escheat to the [s]tate in which the debtor is incorporated." *Id.* at 500. The Court thus reiterated the importance of "adhering to [its] precedent" to "resolve escheat disputes between [s]tates in a fair and efficient manner," *id.* at 510, and explained that "[t]o craft different rules for the novel facts of each case would" result in "so much uncertainty and threaten so much expensive litigation" as to frustrate the power to escheat. *Id.* In addition, the Court explained that the *Texas* priority rules protect individuals from having their property interests "cut off or adversely affected by state action … in a forum having no continuing relationship to any of the parties to the proceedings." *Id.* at 504 (quoting *Pennsylvania*, 407 U.S. at 213). Accordingly, "no state may supersede [the rules] by purporting to prescribe a different priority under state law." *Id.* at 500. Thus, throughout the *Texas* trilogy, the Supreme Court emphasized the importance of having bright-lines rules for determining which state can escheat disputed property and preventing states without a recognized interest from staking a claim.

### 2.     New Jersey Retail Merchants

Applying the guidance given in the *Texas* cases, our opinion in *New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, resolved a significant question that had been left unsettled, namely whether the priority rules set out by the Supreme Court are exclusive. 669 F.3d at 391-96. In other words, if both of the two states empowered to escheat property under the *Texas* trilogy – *i.e.*, the creditor's last known state of residence and the debtor's state of incorporation – are unwilling or unable to escheat the property, may another state attempt to do so? We said no.

19

In *New Jersey Retail Merchants*, a variety of sellers of stored-value cards brought a challenge to New Jersey's abandoned property law. Reminiscent of the law at issue in *Pennsylvania v. New York*, the New Jersey law contained a place-of-purchase presumption whereby, if the address of a purchaser of a card was unknown, the law would presume the address to be the place where the stored-value card was purchased. *Id.* at 394. After reviewing the *Texas* trilogy, we concluded that New Jersey's presumption was invalid because the State did "not have a sufficient connection with any of the parties to the transaction to claim a right to escheat the abandoned property." *Id.* We explained that the Supreme Court's "primary concern" in the *Texas* cases "was to clearly and definitively resolve disputes among states regarding the right to escheat abandoned property," and that "allowing states to implement additional priority rules" was incompatible with that precedent and would create uncertainty. *Id.* at 395-96. Therefore, the two states allowed to escheat under the priority rules of the *Texas* cases are the *only* states that can do so.

We thus expressly rejected New Jersey's argument "that[,] without the place-of-purchase presumption, [debtors] that are incorporated in states that do not escheat abandoned property would unfairly have the right to retain the abandoned property." *Id.* at 395. We said that that "potential of a windfall" did not justify departing from the rules set out by the Supreme Court. *Id.* (relying on *Pennsylvania*, 407 U.S. at 214). Moreover, since "a state's power to escheat is derived from the principle of sovereignty," a state is also entitled to choose not to escheat property. *Id.* "[S]tates may want to incentivize companies to incorporate in their jurisdiction by choosing not to escheat abandoned property." *Id.* Efforts by

20

a state outside of the established rules of priority to escheat the property would be disrespectful to "the principle of sovereignty" and would effectively be an attempt to "force a state to escheat against its will." *Id.*

The implications of *New Jersey Retail Merchants* for this case are clear. If it is true, as Marathon and Speedway allege, that the Ohio Subsidiaries are the holders of the abandoned gift card money, then Delaware cannot escheat that money even though Ohio has disclaimed any interest in doing so. And Delaware does not contest that conclusion. Indeed, it asserts that its law is fully consistent with the *Texas* trilogy and that it does not claim the right to escheat such property. *See* Del. Code Ann. tit. 12, §§ 1139-1141 (2017) (laying out when Delaware can escheat property in a manner compatible with the *Texas* trilogy). Instead, the State argues that it is entitled to conduct an examination to determine if the money is in fact held by the Ohio Subsidiaries, an argument that we will turn to later. First, however, we consider threshold questions of standing and ripeness.

### B.      Private Party Standing

The *Texas* cases involved states suing each other over escheatment rights. Not surprisingly, then, the language of those decisions focuses on resolving claims among states. *See, e.g.*, *Texas*, 379 U.S. at 679 ("[W]e are faced here with the ... problem of deciding which [s]tate's claim to escheat is superior to all others."). The Supreme Court did not have occasion to determine whether a private party has standing to challenge a state's application of the priority rules to escheat

21

property.[13]  As a result, a split has emerged on that question in opinions issuing from lower federal courts.  While there are

[13] Neither the parties nor the District Court framed Marathon's and Speedway's ability to bring suit as a question of standing.  Nevertheless, we address it as such because it fundamentally asks "who may bring the action."  *Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1462 (3d Cir. 1994) ("Correct analysis in terms of ripeness tells us when a proper party may bring an action and analysis in terms of standing tells us who may bring the action."); *cf. Am. Exp. Travel Related Servs. Co. v. Sidamon-Eristoff*, 755 F. Supp. 2d 556, 597 (D.N.J. 2010), *order clarified* (Jan. 14, 2011), *aff'd sub nom. Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359 (3d Cir. 2012), and *aff'd sub nom. New Jersey Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374 (3d Cir. 2012) (treating the issue of a private party's ability to challenge a state's escheat laws as a question of standing).

Even if we frame the question as whether the federal common law escheatment scheme created in the *Texas* trilogy contains a private right of action, the primary inquiry remains one of standing.  *Cf. Middlesex Cty. Sewerage Auth. v. Nat'l Sea Clammers Ass'n*, 453 U.S. 1, 11 & n.17 (1981) (stating that certiorari was granted to determine "whether a private citizen has standing to sue for damages under the federal common law of nuisance[,]" but ultimately concluding that the Court did not need to address the issue because federal common law was replaced by federal statutes).  We do not believe the Supreme Court's decision in *Lexmark Int'l, Inc. v. Static Control Components, Inc.*, 134 S. Ct. 1377 (2014), counsels otherwise.  There, the Supreme Court said that "the zone-of-interests analysis, which asks whether 'this particular

class of persons ha[s] a right to sue under this substantive statute[,]'" focuses on whether a party "has a cause of action under the statute" and requires application of "traditional principles of statutory interpretation." *Id.* at 1387-88. *Lexmark* clarified that, for those reasons, the zone-of-interests analysis is not a constitutional or prudential standing inquiry meant to ensure federal court jurisdiction but rather is a statutory question to be addressed on the merits. *See id.* at 1387 n.4 (indicating that "statutory standing" and "prudential standing" are not proper descriptions of the zone-of-interests analysis because "the absence of a valid (as opposed to arguable) cause of action does not implicate subject-matter jurisdiction, *i.e.*, the court's statutory or constitutional *power* to adjudicate the case'" (emphasis in original)); *see also Maher Terminals, LLC v. Port Auth. of N.Y. & N.J.*, 805 F.3d 98, 105 (3d Cir. 2015) (noting that "[t]he Court clarified [in *Lexmark*] that the zone-of-interests requirement goes to whether a particular plaintiff has a cause of action under a given law, not a plaintiff's standing" and "*Lexmark* strongly suggests that courts shouldn't link the zone-of-interests test to the doctrine of standing").

Here, the question does not involve a statute and is not resolvable using traditional tools of statutory interpretation. Instead, whether a private party has the right to invoke the federal common law crafted by the Supreme Court as a matter of its original jurisdiction in the *Texas* trilogy implicates our constitutional power to adjudicate the case at all. In the absence of a private cause of action under federal common law to enforce the priority rules, there is no cognizable case or controversy over which a federal court may exercise its limited subject matter jurisdiction. *See Illinois v. Milwaukee*, 406 U.S. 91, 100 (1972) (concluding that "[28 U.S.C. §] 1331

23

plausible arguments on both sides, we conclude that the Supreme Court's precedent does permit a private cause of action to enforce the priority rules.

Our decision in *New Jersey Retail Merchants*, has already said as much, albeit by implication. *See generally* 669 F.3d 374. The United States District Court for the District of New Jersey had rejected the State of New Jersey's argument that private parties were without standing to challenge the State's escheat guidelines. *Am. Exp. Travel Related Servs. Co. v. Sidamon-Eristoff*, 755 F. Supp. 2d 556, 597 (D.N.J. 2010), *order clarified* (Jan. 14, 2011), *aff'd sub nom. Am. Exp. Travel Related Servs., Inc. v. Sidamon-Eristoff*, 669 F.3d 359 (3d Cir. 2012), and *aff'd sub nom. N.J. Retail Merchants Ass'n v. Sidamon-Eristoff*, 669 F.3d 374 (3d Cir. 2012). The district court emphasized that private parties have a significant interest in requiring compliance with the rules of priority. *Id.* at 598. If a stored value card issuer is incorporated in a state that does not escheat certain types of abandoned property, then that party is "entitled to retain the abandoned [property] when the address of the owner is unknown." *Id.* at 597. Accordingly, any priority rules contrary to the *Texas* trilogy would "deprive[] corporations of the benefit of the secondary rule." *Id.*

On appeal to us, the parties in *New Jersey Retail Merchants* fully briefed the question of private party standing to sue for enforcement of the *Texas* priority rules. We affirmed on the merits, without discussing the question of standing or the right of private parties to bring suit, *N.J.*

---

will support claims founded upon federal common law as well as those of a statutory origin").

*Retail Merchs.*, 669 F.3d at 400, but because the issue had been framed as a question of standing, our decision to address the merits certainly suggests that we accepted there was standing.

In any event, even if our decision in that case had not effectively determined that a private party can enforce the *Texas* priority rules, we would come to that conclusion here. In *Texas*, the Supreme Court noted that the escheatment priority scheme it provided was the product of a particular need. "Since the States separately are without constitutional power to provide a rule to settle this interstate controversy and since there is no applicable federal statute," the Court said, "it becomes our responsibility in the exercise of our original jurisdiction to adopt a rule which will settle the question of which State will be allowed to escheat [the] intangible property." *Texas*, 379 U.S. at 677. Nonetheless, the reasoning of the *Texas* cases is directly applicable to disputes between a private individual and a state. The Supreme Court established those priority rules in part because subjecting individuals to the risk of "double liability" would violate the Due Process Clause. *Id.* at 676; *see also Standard Oil Co. v. New Jersey,* 341 U.S. 428, 443 (1951) ("The Full Faith and Credit Clause bars any … double escheat."). In other words, the priority rules were created not merely to reduce conflicts between states, but also to protect individuals. *See W. Union*, 368 U.S. at 79 (noting that overlapping escheat inquiries "present[] problems of great importance to the [s]tates and persons whose rights will be adversely affected by escheats").

Moreover, the Supreme Court has strictly applied its priority rules to prevent "intangible property rights" from

"be[ing] cut off or adversely affected by state action … in a forum having no continuing relationship to any of the parties to the proceedings." *Pennsylvania*, 407 U.S. at 213 (internal quotation marks omitted); *Delaware*, 507 U.S. at 504. That concern for action by a state without a "continuing relationship" to the people whose property is at issue would make little sense if the *Texas* trilogy were solely concerned with the competing interests of states. After all, a state with a superior interest could seek to recover property even after it has been escheated by another state. *See Texas*, 379 U.S. at 682 (noting that a state escheating property under the *Texas* trilogy "retain[s] the property for itself only until some other [s]tate comes forward with proof that it has a superior right to escheat"). Additionally, one of the defendants in the original *Texas* case was in fact a private party, which strengthens the conclusion that such parties can sue to enforce the *Texas* priority rules. *See Texas*, 379 U.S. at 675-76 (acknowledging that the Sun Oil Company was a party to the suit and had asked "to be protected from the possibility of double liability"). It makes little sense to require a private party to wait to be sued by a state before that party can assert its rights. If private parties may be defendants in disputes over the priority rules when their interests are at stake, they by rights should also be allowed to sue for enforcement of the priority rules to ensure protection of those same interests.

In reaching the opposite conclusion, the District Court in this case relied on an earlier opinion from the District of Delaware, *Temple-Inland, Inc. v. Cook*, 82 F. Supp. 3d 539 (D. Del. 2015). The *Temple-Inland* court decided that the "*Texas* cases apply to disputes among [s]tates, not to disputes between private parties and [s]tates[.]" *Id.* at 549. It cited "the well-established principle that federal courts may not

26

ordinarily displace state law," absent clear indications to the contrary. *Id.* at 550. We share the *Temple-Inland* court's concern about turning ordinary matters of state law into questions of federal law. But without a private cause of action, the *Texas* trilogy's protections of property against escheatment would, in many instances, become a dead letter. Denying a private right of action would leave property holders largely at the mercy of state governments for the vindication of their rights.[14] Making private rights contingent on state action would likewise undermine the Supreme Court's goal of national uniformity, because whether an individual is protected would depend on whether a state brings suit to contest escheatment of the property. *Cf. Am. Petrofina Co. of Tex. v. Nance*, 697 F. Supp. 1183, 1187 (W.D. Okla. 1986) (concluding that private parties could enforce the *Texas* trilogy "because the decision was rendered as a result of the Supreme Court exercising its original jurisdiction and to ensure uniformity"), *aff'd*, 859 F.2d 840, 842 (10th Cir. 1988) (agreeing with "the [district] court's findings and conclusions on the preemption issue"). Therefore, we conclude that the Supreme Court's desire for a

---

[14] Arguably, private parties would not be totally without recourse, even if we rejected a private cause of action to enforce the *Texas* trilogy. Since the Due Process and Full Faith and Credit clauses protect individuals from being forced to pay the same property value to multiple states, a private party could seek legal relief to prevent additional states from claiming the same property. That would not, however, protect a corporation from having its assets escheated in the first place, nor would it do anything to prevent overlapping and invasive examinations.

uniform and consistent approach to escheatment disputes indicates that a private right of action is fully appropriate.[15]

Finally, allowing private parties to sue also provides secondary benefits that serve the public interest. In protecting their own interests, private parties may also be aiding states in the maintenance of their sovereignty. As we noted in *New Jersey Retail Merchants,* states are entitled to choose not to escheat property. They may well choose to do so "to incentivize companies to incorporate in their jurisdiction." *N.J. Retail Merchs.*, 669 F.3d at 395. Ohio could have made the decision to not exercise its power to escheat for precisely that reason, and Marathon and Speedway responded by choosing to incorporate their gift-card subsidiaries in Ohio. If Marathon and Speedway cannot sue, then Ohio is wrongly placed in a dilemma. It can either do nothing, allow the property of Ohio corporations to be seized by another state, and thus see the incentive to incorporate in Ohio being undermined, or it can engage in costly litigation to defend property it has no interest in escheating.[16] Allowing private

---

[15] One of the benefits of the *Texas* trilogy is a clear set of rules that allows for "ease of administration." *Texas*, 379 U.S. at 683. Denying a private cause of action would make it easier for states outside of the line of priority to escheat property and would require the Supreme Court to exercise or delegate its original jurisdiction in a greater number of cases, undermining one of the chief benefits of the rules of priority.

[16] There is of course a third option – Ohio could change its laws to escheat the property itself. But as we noted in *New Jersey Retail Merchants*, allowing one state to "force a[nother] state to escheat against its will" is in contravention

parties to sue thus provides a check against one state undercutting another's decision not to escheat.

Delaware argues against a private cause of action by saying it is unnecessary since a holder of abandoned property has no lawful interest in the funds. From the Supreme Court opinion that bears its name, Delaware quotes the Court's statement that "[f]unds held by a debtor become subject to escheat because the [holder] has no interest in the funds" and that "a law requiring the delivery of such [funds] to the [s]tate affects no property interest belonging to the [holder]." *Delaware*, 507 U.S. at 502. Delaware reasons that if a holder has "no property interest" in the funds, the holder does not need to be able to enforce the *Texas* priority rules. There is some precedent for that position. For instance, the Texas Supreme Court has said that allowing Texas to escheat unclaimed property, even if the state would not have priority under the trilogy, would prevent an unjust windfall to those holding unclaimed property and would "bring the funds into the custody" of the state "where reports and procedures would be available" to allow "other [s]tates to learn of the funds and assert … any superior rights which they may claim." *State v. Liquidating Trs. of Republic Petroleum Co.*, 510 S.W.2d 311, 315 (Tex. 1974); *see also Riggs Nat. Bank of Wash., D.C. v. District of Columbia*, 581 A.2d 1229, 1245 (D.C. Ct. App. 1990) (concluding that *Texas* concerned only "the competing claims of different jurisdictions for escheat of the same property" and was silent with regard to "the relative rights to custody of abandoned property as between a private holder and a state").

---

of "the principle of sovereignty." *N.J. Retail Merchs.*, 669 F.3d at 395.

But that is, at bottom, the very argument we rejected in *New Jersey Retail Merchants*. And adopting that position would leave us blind to reality. In this case, there are no records indicating where the purchasers reside. Ohio has disclaimed any interest in escheating abandoned gift card property. That means the Ohio subsidiaries are entitled to keep the property (assuming that they have it) unless and until someone holding a gift card comes forward to claim the value of the card. Delaware would have us shut our eyes and pretend that Marathon's and Speedway's very real entitlement to hold the property did not exist. There is no persuasive precedent counseling that approach.

## C.     Ripeness

Having decided that Marathon and Speedway have standing to raise their federal common law claim based on the *Texas* trilogy priority rules, we must next determine whether that claim presents a ripe "case[]" or "controvers[y]." U.S. Const. art. III, § 2. The claim, as framed in the complaint, is that Delaware's abandoned property laws are preempted to the extent they allow Delaware to inquire into and escheat property that could not be claimed under the *Texas* priority rules. Based on that claim, the Companies seek both declaratory and injunctive relief.

"[T]he contours of the ripeness doctrine" are particularly difficult to define "with precision" when a party seeks a declaratory judgment. *Step-Saver Data Sys., Inc. v. Wyse Tech.*, 912 F.2d 643, 646 (3d Cir. 1990). Yet, as we recently discussed in deciding *Plains All American Pipeline*, 866 F.3d at 540, there are three key considerations that guide

30

our judgment: "the adversity of the interest of the parties, the conclusiveness of the judicial judgment[,] and the practical help, or utility, of that judgment." *Step-Saver*, 912 F.2d at 647.

Marathon's and Speedway's preemption claim is equivocal. Read one way, the claim is not ripe; read another way, it is ripe but fails on the merits. More specifically, to the extent the Companies question the scope and intensity of Delaware's audit, that claim is not ripe at this time. On the other hand, to the extent they argue that Delaware cannot even conduct an audit to verify the allegation that the abandoned property in question is held by the Ohio Subsidiaries, that is a ripe but meritless claim.

### 1.     Challenge to the Scope of the Audit

The first variation of the Companies' claim – focusing on the scope and intensity of the audit – is like one we recently agreed was unripe in *Plains All American Pipeline*. The district court there rejected the claim on ripeness grounds, 201 F. Supp. 3d 547, 559 (D. Del. 2016), and we affirmed, with a limited exception not relevant here.[17] The reasons for our affirmance are fully present now. The Companies' challenge is predicated on the speculative assumption that Delaware will ultimately attempt to escheat

---

[17] The plaintiff in *Plains* also argued that Kelmar's involvement in the audit violated due process since Kelmar had a conflict of interest. That claim could be resolved without factual development, and so we concluded that the District Court erred in dismissing it. *Plains All Am. Pipeline*, 866 F.3d at 545.

31

property that it is not entitled to escheat. But at this point, Delaware has not even formally demanded compliance with the audit, so Marathon and Speedway are "not yet in a place where [they] must choose between submitting to the audit or facing penalties[.]"[18] *Plains All Am. Pipeline*, 866 F.3d at 542. And even if Delaware makes a formal demand for documents, "the costs of administrative investigations are usually not sufficient, however substantial, to justify review in a case that would otherwise be unripe." *Id.* Moreover, the validity of Delaware's audit may "turn largely on how it is enforced," and also on the question of who in fact is the holder of the property, suggesting that a decision at this time would be inconclusive and lacking in practical utility absent further factual development. *Id.* at 544.

To be sure, Marathon and Speedway make troubling accusations about Delaware's escheat auditing process. And those allegations are supported by the thorough opinion in *Temple-Inland, Inc. v. Cook*, 192 F. Supp. 3d 527, 527 (D. Del. 2016). The court in that case noted that Kelmar, the State's contract auditor, had "relie[d] heavily on property escheatable only to other states to increase the amount of unclaimed property owed to Delaware." *Id.* at 537. Accordingly, Marathon and Speedway have good reason to be concerned that Delaware may claim property that it is not entitled to escheat, placing them "at risk of multiple liability."

---

[18] While there are factual differences between this case and *Plains*, for instance, the fact that an audit has been ongoing for several years in this case and was in its infancy in *Plains*, those differences do not alter the critical fact that Delaware has as yet taken no formal steps to compel cooperation with its audit of Marathon and Speedway.

*Id.* at 541. In addition, if Delaware's examination process proves in this case to be "a game of 'gotcha' that shocks the conscience,'" *id.* at 550, as it did in *Temple-Inland*, then Marathon and Speedway are justified in their fear that Delaware will draw out the audit and continue to find new reasons for a prolonged investigation. And Kelmar's financial incentive to claim as much escheatable property as possible taints the entire process with an appearance of self-interested overreaching. Nevertheless we cannot ignore that, at this junction, Marathon and Speedway are effectively in control: they can simply refuse to cooperate.

We are also cognizant of the availability of state law remedies if Delaware does make a formal demand for documents. In light of recent amendments to Delaware's abandoned property laws, there are some unanswered questions that bear on the audit.[19] As a matter of comity, it would be well if Delaware had the opportunity to address

---

[19] Indeed, a proposed Abandoned or Unclaimed Property Reporting and Examination Manual was recently before the public for notice and comment. It concerns, among other things, the estimation methods that the Escheator is entitled to use, record retention requirements, and the process for requesting an expedited examination. Delaware Department of Finance, Public Notice 104 Department of Finance Abandoned or Unclaimed Property Reporting and Examination Manual, http://regulations.delaware.gov/register/august2017/proposed/21%20DE%20Reg%20123%2008-01-17.pdf.

those issues in the first instance.[20]  So, even if this challenge were ripe, we might "decline jurisdiction over a declaratory

---

[20] We encourage Marathon and Speedway to take advantage of state remedies.  But, while we do not decide the matter here, we note that challenging the audit in state court may bar a subsequent challenge in a federal district court.  If the Companies bring their state law and federal law claims in state court, the *Rooker-Feldman* doctrine may prevent the District Court from entertaining an attempt to relitigate those claims.  *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005) (holding that the *Rooker-Feldman* doctrine prevents federal district courts from exercising jurisdiction over "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments").  And to the extent *Rooker-Feldman* and 28 U.S.C. § 1257 do not "stop a district court from exercising subject-matter jurisdiction simply because a party attempts to litigate in federal court a matter previously litigated in state court[,]" primarily because the "federal plaintiff 'present[s] some independent claim, albeit one that denies a legal conclusion that a state court has reached in a case to which he was a party[,]'" *id.* at 293 (second alteration in original), preclusion doctrine may bar that subsequent independent claim from being heard in federal district court.  Nevertheless, we do not at this time opine on the potential preclusive impact of a state court judgment because that issue depends on an interpretation of state law and, in any event, is not before us.  *See Parsons Steel, Inc. v. First Ala. Bank*, 474 U.S. 518, 523 (1986) ("[A] federal court must give the same preclusive effect to a state-court judgment as another court of that State

judgment action" to allow the state court system an opportunity to resolve those questions of state law.[21] *See Reifer v. Westport Ins. Corp.*, 751 F.3d 129, 137 (3d Cir. 2014) (concluding that it was not abuse of discretion for the district court to decline jurisdiction over a declaratory judgment action because state law issues "peculiarly within the purview of the [state] court system" were raised). In any

---

would give."). Finally, we are not saying anything about whether Marathon and Speedway are required to raise their federal complaints in state court. *Cf. Bradley v. Pittsburgh Bd. of Educ.*, 913 F.2d 1064, 1071 (3d Cir. 1990) (discussing the requirements for the reservation of federal issues when a party is forced to litigate a claim in state court).

[21] Our discretion under the Declaratory Judgment Act is "not limited" by the parameters of a "more limited doctrine of abstention" such as *Burford* or *Colorado River* Abstention. *United States v. Commonwealth of Pa., Dep't of Envtl. Res.*, 923 F.2d 1071, 1074 (3d Cir. 1991). When a claim for injunctive relief is "dependent on declaratory claims," we also "retain[] discretion to decline jurisdiction of the entire action[.]" *Rarick v. Federated Serv. Ins. Co.*, 852 F.3d 223, 229 (3d Cir. 2017). That is the case here, as entry of injunctive relief would require us to thoroughly examine Delaware's unclaimed property laws to determine the extent to which a potential conflict with the *Texas* priority rules is possible. (*See* App. at 55 (requesting that the District Court "[d]eclar[es] that the DUPL violates and is preempted by the federal common law established in the *Texas Cases*").) Since the preemption claim cannot "be adjudicated without the requested declaratory relief," we have the discretion to decline to hear it. *Rarick*, 852 F.2d at 228 (citation omitted).

event, a challenge to the scope of Delaware's audit is not properly before us at this time.

## 2. Challenge to Delaware's Auditing Authority

If one considers the Companies' claim, as the District Court did, to be a challenge to Delaware's authority to conduct any audit at all, then this case is distinguishable from *Plains*. "[T]he adversity of the interest of the parties, the conclusiveness of [a] judicial judgment and the practical help, or utility, of [a] judgment" would all then favor resolving Marathon's and Speedway's complaint. *Step-Saver*, 912 F.2d at 647. In *Plains*, the claim was not that "Delaware lacks the authority to conduct its audit." *Plains All Am. Pipeline*, 866 F.3d at 542. When the claimed injury "is the process itself," *Sayles Hydro Assocs. v. Maughan*, 985 F.2d 451, 454 (9th Cir. 1993), in the manner it is here, then the interests of the parties are clearly adverse. *Cf. Freehold Cogeneration Assocs., L.P. v. Bd. of Regulatory Comm'rs of State of N.J.*, 44 F.3d 1178, 1188 (3d Cir. 1995) (concluding in a different context that a preemption claim could proceed "[i]n light of the ongoing proceedings before" a regulatory agency).[22]

---

[22] Delaware argues that since its "law provides Marathon protection from the risk of double liability," there is no real risk of injury and no true adversity. (Ans. Br. at 29.) It points to a section of the Delaware Code which provides that "[i]f a holder pays or delivers property to the State Escheator in good faith and thereafter ... another state claims the money or property ... , the State Escheator, acting on behalf of the State, upon written notice of the claim, shall defend the holder against the claim and indemnify the holder

36

Likewise, any judgment we issue regarding the authority to audit will be conclusive because it "definitively would decide the parties' rights." *NE Hub Partners, L.P. v. CNG Transmission Corp.*, 239 F.3d 333, 344 (3d Cir. 2001). If Delaware is not entitled to even ask the Companies for information, then the audit is effectively at an end. Accordingly, a decision would be of real practical value to the parties, since a judgment would "clarify [the] legal relationships so that plaintiffs (and … defendants) could make responsible decisions about the future." *Step-Saver*, 912 F.2d at 649. In short, to the extent that Marathon and Speedway are challenging the authority of Delaware to conduct an audit, that claim can be addressed now.

### D.    Delaware's Auditing Authority

Marathon and Speedway argue that Delaware has abused its examination authority and violated the *Texas* trilogy by conducting an audit into property that is not escheatable. In essence, they say that Delaware must take them at their word and cannot inquire into their books and

against any liability on the claim." Del. Code Ann. tit. 12, § 1153(c) (2017). But despite the promise of indemnification, a party subject to escheat investigations still incurs the costs of a lengthy inquiry, the risk of penalties based on the failure to comply, and the risk of overlapping inquiries by other states. Though the costs of complying with an administrative investigation will not typically create a ripe dispute where none exists, *see supra* p. 27, their existence is a meaningful rebuttal to Delaware's indemnification argument. The State cites no authority for its claim that a duty to indemnify negates ripeness.

records to see if the property belongs to them or the Ohio Subsidiaries.

We disagree. The *Texas* cases do not prevent Delaware from examining books and records to determine the true holder of abandoned property. To the contrary, the Supreme Court has noted that the first step in determining the right to escheat property involves a "determin[ation] [of] the precise debtor-creditor relationship as defined by the law that creates the property at issue." *Delaware*, 507 U.S. at 499. By requesting an opportunity to look at the books and records of Marathon and Speedway and their Ohio Subsidiaries, Delaware is seeking information that it says will help make that determination. It is possible that once the debtor-creditor and parent-subsidiary relationships have been fairly examined, Delaware may determine that some portion of the property is actually held by Marathon and Speedway rather than the Ohio Subsidiaries and is therefore subject to escheatment in Delaware. At the very least, that is not an illegitimate basis for an appropriately targeted audit.[23]

---

[23] Marathon and Speedway rely heavily on language from *NE Hub* to argue that preemption is required in this case. *See NE Hub*, 239 F.3d at 348 ("[I]f it is evident that the result of a process must lead to conflict preemption, it would defy logic to hold that the process itself cannot be preempted[.]"). However, in *NE Hub*, we expressly warned that our opinion "should not be overread." *Id.* at 349 n.18. The language from *NE Hub* that the Companies cite does not apply here. We are not focused on Delaware's auditing process itself. We are discussing in the abstract the ability of the State to audit, and we have concluded that Delaware's ability to conduct an examination is not directly contrary to

The Companies argue that Delaware is entitled only to look within the four corners of their contracts with their Ohio Subsidiaries but no further.  (*See* Opening Br. at 42 (arguing that all that is needed is "simple contract interpretation.").)  Because the contracts state that the Ohio Subsidiaries are ultimately responsible for the gift cards, Marathon and Speedway say the case is closed.  (*See* Oral Arg. Tr. at 10 (positing that "there can be no further inquiry" by the State after a contract is shown).)  But the *Texas* trilogy does not stand for the proposition that states must ignore anything beyond the pages of a contract.  "[D]etermining the precise debtor-creditor relationship," *Delaware*, 507 U.S. at 499, may at times be a fact-based inquiry into whether the formalities of corporate separateness have been observed, not just in

the *Texas* trilogy, and at times such an examination may even be necessary under the first step of the Supreme Court's three-step test.  Whether the specific process Delaware employs to conduct its audits, and the result of that process, are preempted is not decided today because that issue is not ripe.

Instead, other language in *NE Hub* is instructive.  In that case, we also said, "it would be entirely logical in an appropriate case to hold that the process is not preempted but to hold later that the result of the process is preempted." *Id.* at 348.  This is "an appropriate case," *id.*, where we have concluded that the ability to have a process is not preempted, without saying anything about the result or specifics of the process as actually carried out.  Of course, none of this should be taken to suggest that Delaware is free to use a "we're just trying to define the debtor-creditor relationship" rationale as a pass for abusive auditing practices.

39

theory but in practice. *Cf. Pearson v. Component Tech. Corp.*, 247 F.3d 471, 484-85 (3d Cir. 2001) (noting that the test for determining if one corporation is merely an alter ego involves consideration of a variety of factual questions such as the "nonpayment of dividends" or the "nonfunctioning of officers and directors"); *United States v. Kayser-Roth Corp.*, 910 F.2d 24, 27 (1st Cir. 1990) (determining whether a parent corporation is an operator of a subsidiary by examining a variety of factual matters such as the existence of overlapping directors and officers).[24]

According to Marathon's and Speedway's rendering of the law, a corporation can avoid an audit or any other inquiry merely by setting up a shell company. All the corporation needs is a well-worded contract. And Delaware indeed alleges that some corporations have been taking exactly that route to hide abandoned property. *See State ex rel. French v. Card Compliant, LLC*, No. N13C-06-289PRWCCLD, 2017 WL 1483523, at \*1 (Del. Super. Ct. Apr. 21, 2017) (discussing Delaware's argument that a number of the State's corporate citizens had "attempted to cheat Delaware out of its portion of unused gift card balances via use of out-of-state 'shell' entities devised to hold [those] funds"), *interlocutory appeal refused sub nom. French v. Ruth's Hosp. Grp., Inc.*, No. 205, 2017, 2017 WL 2290067 (Del. May 23, 2017). We do not read the *Texas* trilogy as foreclosing a state's right to

---

[24] At oral argument, Marathon and Speedway took the position that doctrines such as piercing the corporate veil, which allow courts to disregard corporate forms in the face of fraud, are inapplicable in the escheat context. (Oral Arg. Tr. at 19-20.) We know of no basis for that assertion and the Companies have certainly not provided one.

conduct an appropriate examination to determine if there is fraud or another basis for determining that property may be escheated, even if a contract viewed in isolation might suggest otherwise. Marathon's and Speedway's argument to the contrary is unpersuasive and we reject it.

Our decision today does not, however, foreclose the possibility that a state's demands for information may become so obviously pretextual or insatiable, and the record so clearly developed, that "it is evident that the result of [the] process must lead to conflict preemption[.]" *NE Hub*, 239 F.3d at 348. In such circumstances, "it would defy logic to hold that the process itself cannot be preempted." *Id.* When an audit process drags beyond a legitimate inquiry into whether subsidiary companies are in fact bona fide, separate entities, the priority rules may be triggered and the State's audit process preempted. Determining the difference between a state's legitimate inquiry into a parent-subsidiary relationship, on the one hand, and, on the other, an abusive process designed to force a monetary settlement, may not always be a simple matter. Hard or not, though, it will have to be done and, in the event, the effort will likely be guided in part by asking whether the state has gone past what is needed to address familiar standards used to distinguish bona fide subsidiaries from mere alter egos. *See, e.g.*, *Maloney-Refaie v. Bridge at Sch., Inc.*, 958 A.2d 871, 881 (Del. Ch. 2008) (reciting the factors that guide alter ego analysis under Delaware law); *Island Seafood Co. v. Golub Corp.*, 759 N.Y.S.2d 768, 769-70 (N.Y. App. Div. 2003) (same with respect to New York law); *Lumax Indus. v. Aultman*, 669 A.2d 893, 895 (Pa. 1995) (same with respect to Pennsylvania law).

At some point, consistent application of the *Texas* trilogy's priority rules may require the adoption of a uniform federal standard for determining corporate separateness. *Cf. Texas*, 379 U.S. at 677 (indicating that the priority scheme was developed as a matter of federal common law); *United States v. Pisani*, 646 F.2d 83, 87-89 (3d Cir. 1981) (crafting a federal common law alter ego test for determining personal liability under the federal Medicare statute); *United States v. Kimbell Foods, Inc.*, 440 U.S. 715, 728-29 (1979) (supporting adoption of a uniform federal common law rule when state law would frustrate specific objectives of a federal scheme, a need for national uniformity exists, and a federal rule would not disrupt commercial relationships founded upon state law). But that is an issue for another day. It is enough for now to note that there is well developed law on that subject under various state and federal precedents. The only question properly before us today is whether Delaware has the authority to dig for information about who, a parent or a subsidiary, is the true holder of escheatable funds, and the answer to that is plainly yes. The preemption claim brought by Marathon and Speedway is otherwise unripe and subject to dismissal.

### E.    Dismissal Shall Be Without Prejudice

Even though we agree with the District Court's determination to dismiss the preemption claim, we will nevertheless vacate and remand so that the Court can clarify that the claim is dismissed without prejudice. *See Presbytery of N.J. of Orthodox Presbyterian Church v. Florio*, 40 F.3d 1454, 1461 (3d Cir. 1994) (noting that dismissals for lack of justiciability are ordinarily without prejudice). While the challenge to the scope of the audit is not now ripe, it is

42

possible that Marathon and Speedway will have a viable claim in that regard at a later date.

## III.   Conclusion

For the foregoing reasons, we will vacate the District Court's judgment and remand with instructions to enter an order of dismissal of Marathon's and Speedway's preemption claim that is without prejudice to it being revived at a later date, if appropriate.