# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Joseph M. Torsella, in his official  :
capacity as the Treasurer of the  :
Commonwealth,  :
                    Plaintiff  :
                      :
             v.  :    No. 272 M.D. 2019
                     :    Argued:  April 14, 2021
PPL Corporation,  :
                    Defendant  :
                      :

BEFORE:     HONORABLE RENÉE COHN JUBELIRER, Judge
                 HONORABLE MARY HANNAH LEAVITT, Judge
                 HONORABLE PATRICIA A. McCULLOUGH, Judge
                 HONORABLE ANNE E. COVEY, Judge
                 HONORABLE MICHAEL H. WOJCIK, Judge

**OPINION NOT REPORTED**

MEMORANDUM OPINION BY
JUDGE COHN JUBELIRER             FILED:  July 20, 2021

Presently before the Court in our original jurisdiction are PPL Corporation's (PPL) Revised Preliminary Objections in the nature of a demurrer to the Complaint filed by Joseph M. Torsella, in his official capacity as the Treasurer of the Commonwealth (Treasurer).[1]  Through the Complaint, Treasurer asks this Court to order PPL to produce the information and documents that Treasurer requested from PPL in a March 13, 2019 administrative subpoena (Subpoena).  Treasurer issued the Subpoena attempting to compel PPL to more fully cooperate with Treasurer's

---

[1] At the time the Complaint was filed, Torsella was the Treasurer of the Commonwealth of Pennsylvania.  Subsequently, Stacy Garrity was elected Treasurer at the November 3, 2020 general election and was sworn into office on January 19, 2021.

unclaimed property audit of PPL's shareholder records, including producing previously withheld information in electronic format. Treasurer also asks the Court to declare that PPL's refusal to produce the information and documents as requested by the Subpoena is contrary to Pennsylvania law. PPL argues the Complaint is legally insufficient and should be dismissed with prejudice because PPL has already complied with the Subpoena and The Fiscal Code,[2] including Article XIII.1 thereof, also known as the Disposition of Abandoned and Unclaimed Property Act (DAUPA),[3] by producing certain records containing shareholder data potentially subject to DAUPA and by offering Treasurer's designated auditor, Kelmar Associates LLC (Kelmar), access to PPL's facility to conduct a further review of its records. PPL contends that Treasurer lacks the statutory authority to compel the electronic production of PPL's records, particularly records revealing its shareholders' personally identifiable information (PII). Because it does not appear with certainty that Treasurer (1) is precluded from compelling the production of PPL's shareholder records; (2) is not authorized to verify the accuracy of PPL's records; and (3) may not compel PPL to produce its shareholders' PII, we overrule PPL's Revised Preliminary Objections.

Initially, we observe that when ruling on preliminary objections, the Court must accept all well-pleaded factual allegations as true, along with any inferences reasonably deduced therefrom. *Neely v. Dep't of Corr.*, 838 A.2d 16, 19 n.4 (Pa. Cmwlth. 2003). Preliminary objections should not be sustained unless it "appear[s]

---

[2] Act of April 9, 1929, P.L. 343, *as amended*, 72 P.S. §§ 1-1805.
[3] Article XIII.1 was added to The Fiscal Code by Section 5 of the Act of December 9, 1982, P.L. 1057, 72 P.S. §§ 1301.1-1301.29.

with certainty that the law will not permit recovery and any doubt should be resolved by a refusal to sustain them." *Id.*

## I. Escheatment and The Disposition of Abandoned and Unclaimed Property Act

As this case turns on an interpretation of DAUPA, we begin by examining the basic provisions of that law. Because states are considered sovereigns, they may "take custody of or assume title to abandoned personal property as *bona vacantia*, a process commonly (though somewhat erroneously) called escheat." *Delaware v. New York*, 507 U.S. 490, 497 (1993). The term "escheat" originally applied only to realty,[4] while the analogous common law principle – *bona vacantia* – applied to personalty. Note, *Origins and Development of Modern Escheat*, 61 COLUM. L. REV. 1319, 1326 (1961). The term "escheat" now applies equally to real and personal property. *Delaware*, 507 U.S. at 497 n.9. "Every state and the District of Columbia has a set of escheat laws, under which holders of abandoned property must turn such property over to the State 'to provide for the safekeeping of abandoned property and then to reunite the abandoned property with its owner.'" *Marathon Petroleum v. Sec'y of Fin. for Delaware*, 876 F.3d 481, 488 (3d Cir. 2017) (quoting *N.J. Retail Merchs. Ass'n v. Sidamon-Eristoff*, 669 F.3d 374, 383 (3d Cir. 2012)). DAUPA sets forth Pennsylvania's escheatment rules.

Pursuant to Section 1301.2 of DAUPA, intangible property that is presumed abandoned is subject to the custody and control of the Commonwealth if:

---

[4] For example, in the early case *O'Hanlin v. Van Kleeck*, 20 N.J.L. 31, 44 (N.J. 1842), the Supreme Court of Judicature of New Jersey stated: "It is a general principle in the American law, and which [we] presume is every where declared and asserted, that when the title to land fails from defect of heirs, it necessarily reverts or escheats to the people, as forming part of the common stock to which the whole community is entitled."

(i)     [T]he last known address of the owner,[5] as shown by the records of the holder,[6] is within the Commonwealth; or

(ii)    [T]he last known address of the owner as shown by the records of the holder is within a jurisdiction[] the laws of which do not provide for the escheat or custodial taking of such property, and the domicile of the holder is within the Commonwealth; or

(iii)   [N]o address of the owner appears on the records of the holder and the domicile of the holder is within the Commonwealth.

72 P.S. § 1301.2(a)(2)(i)-(iii). Any certificate of stock or participating right in a business association held by a business association is presumed abandoned and unclaimed if it is unclaimed by the owner for three years. Section 1301.6 of DAUPA, 72 P.S. § 1301.6. After the dormancy period has elapsed and the property is presumed abandoned, the holder of the property must file with Treasurer a report identifying the property. Section 1301.11 of DAUPA, 72 P.S. § 1301.11. The report must include the following information:

(1) [T]he name, if known, and last known address, if any, of each person appearing from the records of the holder to be the owner of any property of the value of fifty dollars ($50) or more;

(2) The nature and identifying number, if any, or description of the property and the amount appearing from the records to be due . . . ; and

(3) The date when the property became payable, demandable, returnable or the date upon which the property was declared or found

---

[5] DAUPA defines "owner," in relevant part, as "a person that has a legal or equitable interest in property subject to this article or a person whose name appears on the record of a holder as the person entitled to property held, issued or owing by the holder . . . ." Section 1301.1 of DAUPA, 72 P.S. § 1301.1.

[6] DAUPA defines "holder," in relevant part, as "a person obligated to hold for the account of or deliver or pay to the owner property which is subject to this article and shall include any person in possession of property subject to this article belonging to another . . . ." 72 P.S. § 1301.1.

to be without a rightful or lawful owner, and the date of the last transaction with the owner with respect to the property . . . .

72 P.S. § 1301.11(b)(1)-(3).

DAUPA requires that Treasurer compile a list based on the reports, which must be made available for examination and copying, that contains the names, items of abandoned and unclaimed property, and last known addresses, if any, of the owners. 72 P.S. § 1301.11(f). In addition, Treasurer must publish a notice of the existence of the abandoned and unclaimed property and attempt to notify by mail the possible owners. Section 1301.12(a), (d) of DAUPA, 72 P.S. § 1301.12(a), (d). The notice must contain the names of the persons listed in the report, the name and address of the holders, and a statement that information concerning the property may be obtained by contacting the holders. 72 P.S. § 1301.12(b). If the property remains unclaimed, then the holders must pay or deliver it to Treasurer. Section 1301.13(a) of DAUPA, 72 P.S. § 1301.13(a).

DAUPA empowers Treasurer to require a person that has not filed a report or a person who Treasurer believes has filed an "inaccurate, incomplete or false report," to file a verified report according to Treasurer's specifications. Section 1301.23(a) of DAUPA, 72 P.S. § 1301.23(a). Moreover, Treasurer is authorized to examine a holder's records (DAUPA's Examination Provisions) as follows:

> (b) . . . Treasurer, at reasonable times and upon reasonable notice, may examine the records of any person or agent thereof to determine whether the person has complied with this article. The administrator may conduct the examination even if the person believes it is not in possession of any property that must be reported, paid or delivered under this article. . . . Treasurer may contract with any other person to conduct the examination on behalf of . . . Treasurer, the selection of whom shall not be questioned.

> (c) . . . Treasurer at reasonable times may examine the records of an agent, including a dividend disbursing agent or transfer agent, of a

5

business association or financial association that is the holder of property presumed abandoned if the administrator has given the notice required by subsection (b) to both the association or organization and the agent at least 90 days before the examination.

72 P.S. § 1301.23(b)-(c). Any work papers that Treasurer "obtain[s] or compile[s]" during the course of an examination "are confidential and are not public records . . . ." 72 P.S. § 1301.23(d).

Article XVI of The Fiscal Code, 72 P.S. § 1602 (The Fiscal Code's Examination and Adjustment Provision), which is not part of DAUPA, sets forth the inquisitorial powers of the Commonwealth's fiscal officers, including Treasurer. The Fiscal Code's Examination and Adjustment Provision provides, in relevant part, the following:

(a) To enable . . . Treasurer to examine and revise [public accounts] and unclaimed property accounts . . . [Treasurer] is [] hereby [] invested with power to compel the exhibition or delivery to [Treasurer] (as the case may be), by any person possessing same, in the manner hereinafter pointed out, of all official or public books, accounts, documents or papers, which have any relation or connection with any public account or abandoned and unclaimed property account, and which [Treasurer] may deem necessary in the investigation, adjustment or collection of the same . . . .

. . . .

(c) In order to procure the exhibition or delivery to [Treasurer] of all public accounts, books, documents, or other papers . . . Treasurer . . . is hereby authorized and required, in case of neglect or refusal to exhibit or deliver them, to issue [a] summons, directed to the sheriff of the county in which the person or persons reside . . . commanding such sheriff to execute such writ, and procure the exhibition or delivery, as the case may be, of the same at [Treasurer's] office; and, if the person or persons summoned . . . neglect or refuse to appear with, or transmit the accounts, books, documents, or other papers, within sixty (60) days . . . such officer may issue [a] writ of attachment, commanding the said sheriff to commit the person or

6

persons . . . to the common jail of the county, there to remain until [the person or persons] comply with this act . . . .

72 P.S. § 1602(a), (c). With this background in mind, we now turn to the facts as alleged by Treasurer.

## II. The Complaint

### A. Factual Allegations

In the Complaint, Treasurer alleges as follows. Treasurer, whose duties and responsibilities are set forth in The Fiscal Code, which includes DAUPA, is the head of the Treasury Department, whose Bureau of Unclaimed Property manages the receipt of unclaimed funds to be returned to the funds' owners. (Complaint ¶ 7.) PPL is a domestic business corporation, a utility company, and a holder of unclaimed property that has reported hundreds of thousands of dollars worth of unclaimed property to Treasurer in recent years. (*Id*. ¶¶ 8-9.)

Treasurer has the authority to audit unclaimed property holders to assure they are complying with their obligations under DAUPA. (*Id*. ¶ 1.) Here, Treasurer designated Kelmar to conduct, on Treasurer's behalf, an unclaimed property audit of PPL's shareholder records. (*Id*. ¶¶ 1, 2, 16.) Kelmar is conducting its audit of PPL's shareholder records on behalf of Treasurer and other states. (*Id*. ¶ 17.) Kelmar commenced its audit by issuing requests for information and documents to PPL pertaining to potentially unclaimed property held by PPL related to securities. (*Id*. ¶ 2.) Specifically, Kelmar requested that PPL provide it with, *inter alia*, extensive data regarding its current registered shareholders, including the following information per shareholder account: first name, last name, middle initial, secondary ownership with relationship code, full mailing address, taxpayer identification number, and account number. (*Id*. ¶ 3; Exhibit (Ex.) 3(C)(A) (Aug. 29, 2017 letter

7

from E. LaCroix of Kelmar to T. Henninger of PPL).) The records Kelmar sought were deemed "necessary to determine (1) the state to which unclaimed property is reportable and (2) whether the statutory prerequisites for a given account being unclaimed have been met such that it is reportable under DAUPA." (*Id.* ¶ 19.)

PPL responded to Kelmar's information requests by producing "heavily edited, redacted[,] and incomplete records" concerning PPL's shareholders and by proposing an "onsite visual view" of PPL's "unredacted, unedited original data that spans 1,000 or more pages, at PPL's offices, using a PPL computer terminal and the limited software that PPL intended to make available." (*Id.* ¶¶ 4, 23.) According to Treasurer, "instead of producing copies of its original data, which includes names, addresses and related information and which PPL possesses in readily-transferable format, PPL created new documents that [] replace[d] the name and other identifying information associated with an account with an 'ACCTKEY' placeholder . . . ." (*Id.* ¶ 21.) PPL also withheld information that PPL believed related to individual shareholders with addresses in states that are not participating in the audit. (*Id.* ¶ 20.) Given how PPL produced the requested data, Kelmar was unable to "run analytics to cross check the accuracy of PPL's data." (*Id.* ¶ 22.)

After attempts to prompt PPL to produce data more responsive to its requests and in a form that could be verified using software analytics proved unfruitful, Treasurer issued the Subpoena on March 13, 2019. (*Id.* ¶ 24, Ex. 1.) The Subpoena includes five categories of requested information, but only the first category, which seeks information concerning PPL's common stock,[7] is relevant to this proceeding.

---

[7] The Subpoena provides as follows:

**For all requests of data here within, provide the following per registered shareowner account:**

**(Footnote continued on next page…)**

(*Id*. ¶ 25, Ex. 1 at 1-2.)   Despite the parties' efforts to resolve their differences concerning the Subpoena and requested documents, they were unable to come to terms, and thus Treasurer filed the Complaint.  (*Id*. ¶¶ 31-34, Exs. 4-6.)

---

- Shareowner registration information including:  first name, last name, middle initial, secondary owner with relationship code, full mailing address, taxpayer identification number, [and] account number[.]

1. **Common Stock**
   A. Provide the following data in electronic format for all current registered shareholders of PPL Corporation's common stock.  Please include data for both restricted and unrestricted stock classes:
      i. Date shareowner account was opened[.]
      ii. Date of most recent shareowner generated contact[.]
      iii. Date shareowner account became undeliverable if applicable[.]
      iv. Listing of outstanding cash payments issue through present including:  type of payment . . . .
      v. Listing of outstanding shares including:  issue date, type of shares (original issue, dividend reinvestment, stock splits, etc.), share amount, certificate number, status of shares . . . .
   B. Provide a listing of all nominee positions [and] overall [Depository Trust Company] position as well as a system generated screenshot of the total balance of these positions on the date that the common stock shareholder population is extracted.
   C. Provide the Issued Shares and Reserve Balancing Report which reconciles to the number of shares issued and outstanding, as well as any reserve positions.  This should include the number of treasury shares, restricted stock awards, non[-]employee director stock ownership, and equity incentive shares.
   D. Provide the date and delivery method (first class mail, email, electronic, etc.) of the last [Internal Revenue Service Form] 1099 that was issued to the owner.
   E. Provide the shareholder registration data associated with all accounts closed within the past two years with a last known address in the participating states along with the date and reason for account closure.
   F. Provide a report of accounts with a last known address in the participating states that have been closed on the books and records of Wells Fargo within the past two years, transferred to a [thi]rd[-]party vendor for escheatment, but have not yet had shares or cash remittances made to the state.
   G. Provide the current Transfer Agent Agreement under which escheatment services are provided for PPL Corporation.

(Complaint, Ex. 1 (emphasis in original).)

9

*B. Legal Claims*

Treasurer asserts two counts based on the above facts. Count 1 seeks injunctive relief, namely an order from this Court compelling PPL's compliance with DAUPA's Examination Provision and The Fiscal Code's Examination and Adjustment Provision. (*Id.* ¶¶ 36, 38.) Treasurer argues that PPL's withholding of documents and information and instead offering to "'exhibit its records on-site' is contrary to the requirements of Pennsylvania law." (*Id.* ¶ 38.) Specifically, Treasurer contends:

a. [DAUPA's Examination Provision] specifically refers to "documents and working papers **obtained or compiled by the []Treasurer, or [] Treasurer's agents**." 72 P.S. § 1301.23(d) . . . Further, the text of [DAUPA's Examination Provision] does not limit an examination to PPL's proposed on-site, visual review.

b. [The] Subpoena was also issued under [The Fiscal Code's Examination and Adjustment Provision], which broadly authorizes [] Treasurer "to compel the exhibition of **delivery to [Treasurer]** (as the case may be)" [of] various holder books and records. 72 P.S. § 1602(a) . . . .

c. [M]ultiple judicial decisions . . . hold that language like DAUPA's authorization for [] Treasurer to "examine" records is construed to include, not just visual review, but also reasonable tests and analytics appropriate to the requesting party's investigation.

d. [T]o limit [] Treasurer . . . to the visual review of thousands of data entries would substantially frustrate the audit[, as the actual data is necessary] to perform accuracy tests and cross-checks[.]

e. [T]here is no good reason for so dramatically limiting the scope of an audit. Data may now be readily, inexpensively[,] and safely transferred electronically; to impose the visual-review-only restriction is plainly anachronistic and inefficient.

(*Id*. ¶ 38(a)-(e) (emphasis in original).) Treasurer requests an order: (1) directing PPL to produce the information and documents described in the first category of the Subpoena, "including but not limited to [(a)] its current, complete[,] and unedited shareholder extract file and [(b)] a current, unredacted version of the Issued Shares and Reserve Balancing Report requested in part 1(C) of the Subpoena," and (2) directing PPL to "cease interfering with and frustrating the orderly and efficient audit being conducted by Kelmar . . . ." (*Id*., Wherefore Clause.) Count 2 seeks declaratory relief, specifically, a declaration that "PPL's refusal to provide the requested information is contrary to Pennsylvania law." (*Id*. ¶ 41.)

### III.   Preliminary Objections

On June 6, 2019, PPL filed its original Preliminary Objections to the Complaint. Treasurer responded by filing Preliminary Objections to PPL's Preliminary Objections on June 26, 2019, seeking to strike PPL's Preliminary Objections because they included factual averments not found in the Complaint. On May 6, 2020, this Court struck portions of PPL's original Preliminary Objections that included or were dependent upon additional facts improperly set forth in PPL's original Preliminary Objections. *Torsella v. PPL Corp.* (Pa. Cmwlth., No. 272 M.D. 2019, filed May 6, 2020).

On July 1, 2020, PPL filed Revised Preliminary Objections to the Complaint. Through this pleading, PPL raises a single objection – Treasurer's Complaint is legally insufficient on several bases. PPL first argues that Treasurer does not have the authority to compel PPL to produce its shareholders' PII, and it has already fully complied with DAUPA by producing electronic records having some of the data Treasurer requested, and by allowing Treasurer to review the full records, including

PII, at PPL's corporate office. Second, PPL contends that the law does not entitle Treasurer to verify the accuracy of PPL's shareholder records using software analytics. Third, PPL submits that Treasurer is attempting, through its Complaint, to enforce the Subpoena, but the Subpoena is improper because it is not limited in scope and specific in directive so that compliance will not be unreasonably burdensome, as electronically producing its shareholders' PII exposes those shareholders to needless risk. We address the parties' arguments seriatim.

## IV. Discussion
### A. Whether Treasurer has Failed to State a Claim Because Treasurer is not Authorized to Compel the Electronic Production of PPL's Shareholder Records.

#### 1. Parties' Arguments

PPL argues that Treasurer's Complaint fails to state a claim because Treasurer is not authorized to compel the electronic production of the requested records. PPL begins by noting that Treasurer issued the Subpoena pursuant to DAUPA's Examination Provision and The Fiscal Code's Examination and Adjustment Provision. PPL, however, interprets DAUPA's Examination Provision to authorize Treasurer merely to examine a holder's or agent's records, not to compel the production of records. (PPL's Brief (Br.) at 11-12.) Moreover, PPL highlights the legislature's use of the disjunctive in the language of The Fiscal Code's Examination and Adjustment Provision giving Treasurer the "power to compel the **exhibition _or_ delivery**" of, *inter alia*, abandoned and unclaimed property accounts. (*Id.* at 12 (quoting 72 P.S. § 1602(a)) (emphasis in original).) PPL appears to suggest that it is the unclaimed property holder, not Treasurer, that may decide whether to exhibit or deliver its records. The disjunction is critical, argues PPL, but the Complaint

12

disregards it, "demand[ing] a form of electronic production that is not required by that statute." (*Id*. at 12-13.)

PPL contends that the Complaint "blurs the language of several statutes to suggest an entitlement to the production of documents that does not actually exist . . . ." (*Id*. at 13.) One example of such blurring is the Complaint's citation to 72 P.S. § 1301.23(d), which refers to work papers "obtained or compiled" by Treasurer, but PPL argues that this exemption of work papers from public disclosure "[i]n no way . . . require[s] the production" of the holder's records. (*Id*. at 14.) PPL concludes that the Complaint fails to state a claim for relief, as the law simply authorizes Treasurer to examine a holder's records, and PPL has already offered to make its shareholder records available for on-site examination, an accommodation that Treasurer has not alleged would be inadequate for purposes of completing its audit or would impose undue burdens or excessive costs.

Treasurer responds that the Complaint states valid claims for relief because Treasurer has the authority to compel PPL to electronically produce its shareholder records. First, Treasurer claims that DAUPA authorizes it to "conduct record examinations in any medium[,]" including electronic media, because DAUPA defines a "record" as "information that is inscribed on a tangible medium or that is stored in an electronic or other medium and is retrievable in perceivable form." (Treasurer's Br. at 18-19 (quoting 72 P.S. § 1301.1).) Treasurer argues that "[i]t defies logic that the General Assembly would, on the one hand, authorize [] Treasurer to examine electronically stored information and direct a holder to retrieve such information, yet on the other hand, limit [] Treasurer's examination to take place only at the holder's place of business and on the holder's computer with whatever software the holder might cho[o]se to make available." (*Id*. at 21.)

13

Second, Treasurer asserts that DAUPA's use of the terms "examine" and "examination" authorizes Treasurer to "direct the production of unclaimed property records." (*Id*. at 19.) Treasurer cites dictionary definitions of these terms: (1) "examine" – "to interrogate closely, to test the condition of and to test by questioning in order to determine [. . .] fitness" and (2) "examination" – "a systematic search for the truth or facts about something." (*Id*. (citation omitted).) Treasurer submits that, "[w]ith respect to large data sets like those at issue in unclaimed property investigations, testing and interrogation are only feasible and efficient by taking possession of electronic documents and running computer-assisted analytics." (*Id*.)

In addition, Treasurer contends that caselaw supports Treasurer's position that Treasurer may require PPL to produce electronic records for examination even though PPL has offered to make its records available for on-site examination. Treasurer relies on several cases, including *Department of Finance v. AT&T Inc.*, 239 A.3d 541 (Del. Ch. 2020), explaining that the Delaware Court of Chancery held that "language identical to DAUPA's authorization to 'examine' unclaimed property records entails the authority to require a holder to query a database and 'provide that information in an electronically useable format.'"[8] (Treasurer's Br. at 20 (quoting *AT&T*, 239 A.3d at 574).)

To accept PPL's interpretation – that it may satisfy its statutory obligations by making its records available for on-site examination – would, according to Treasurer, "impair other state administrative inquiries in multiple contexts." (*Id*. at

---

[8] While Treasurer argues that Treasurer is authorized to compel PPL to produce its records **electronically**, based on our review of PPL's briefs, there does not appear to be disagreement on this point. In its Reply Brief, PPL states that "the parties agree that [] Treasurer has [the] authority to serve a proper subpoena that directs the production of records in electronic format." (PPL's Reply Br. at 4.)

21.) As an example, Treasurer explains that the Department of Banking and Securities is authorized to "[i]nvestigate the business activities of a licensee and person engaged in a business contemplated by this chapter" by, *inter alia*, "[e]xamining the records of the licensee and person." (*Id*. at 20 (quoting 12 Pa. C.S. § 6203(a)(1)(i)).)

Treasurer points out that DAUPA's Examination Provision contemplates "that a holder may submit 'an inaccurate, incomplete or false report' and gives [] Treasurer certain options to remediate." (*Id*. at 22 (quoting 72 P.S. § 1301.23(a)).) In addition, The Fiscal Code's Examination and Adjustment Provision empowers Treasurer to compel the production of records in order to "examine and revise" unclaimed property accounts. (*Id*. at 23 n.8 (quoting 72 P.S. § 1602(a)).) Therefore, according to Treasurer, the statutory scheme acknowledges that Treasurer is authorized to correct errors associated with a holder's unclaimed property accounts, and in order to do so, it follows that Treasurer has a right to obtain copies of relevant data. This right is confirmed, Treasurer notes, based on the language of 72 P.S. § 1301.23(d), which provides that "[d]ocuments and working papers **obtained** or compiled by [] Treasurer . . . in the course of conducting an examination are confidential and are not public records." (*Id*. at 23 (quoting 72 P.S. § 1301.23(d)) (emphasis in original).) Treasurer contends that PPL's argument – that Treasurer blurs the language of several statutes and selectively quotes from subparagraph (d) of DAUPA's Examination Provision to create the impression that the audit section of the DAUPA statute refers to documents and working papers obtained by Treasurer – is incorrect. Treasurer explains that subparagraphs (b) and (d), 72 P.S. § 1301.23(b) and (d), "are part of the same section of the same statute . . . and both relate to [] Treasurer's record examination authority." (*Id*. at 24 n.9.)

15

Moreover, Treasurer suggests that The Fiscal Code's Examination and Adjustment Provision, which should be read *in pari materia* with DAUPA's Examination Provision because they relate to the same person or thing, invests Treasurer with the

> **power to compel the exhibition or delivery to [Treasurer]** . . . of all official or public books, accounts, documents or papers, which have any relation to or connection with any public account or abandoned and unclaimed property account, and which [Treasurer] may deem necessary in the investigation, adjustment or collection of the same.

(*Id*. at 24-25 (quoting 72 P.S. § 1602(a) (emphasis in original)).) Treasurer contends that the choice of whether to examine records by exhibition or delivery is Treasurer's to make. "It is [] Treasurer, not the holder of unclaimed property, that chooses whether to compel the delivery of records, documents, and papers '**to [Treasurer]'** pursuant to [Article] XVI of [T]he Fiscal Code." (*Id*. at 25-26 (emphasis in original).) Not only does PPL's interpretation contradict the provision's plain language, but Treasurer submits that adopting PPL's interpretation "would improperly favor the private interests of an examined party over the public's interest in a meaningful examination by []Treasurer, contrary to the directive that the Court should presume 'that the General Assembly intends to favor the public interest as against any private interest.'" (*Id*. at 26 (quoting Section 1922(5) of the Statutory Construction Act of 1972, 1 Pa.C.S. § 1922(5)).)

Treasurer further contends that the rules of statutory construction and caselaw indicate that Treasurer's examination authority must be read in light of, and liberally construed to achieve, the legislative purposes underlying DAUPA's Examination Provision and The Fiscal Code's Examination and Adjustment Provision. Treasurer explains that the latter provision was intended to facilitate "the investigation,

16

adjustment[,] or collection of" any unclaimed property account, (*id*. at 28 (quoting 72 P.S. § 1602(a))), while the former provision "was amended in 2004 to clarify that its purpose is 'to determine whether the person has complied with this article' and to confirm that the examination may be conducted 'even if the person believes it is not in possession of any property that must be reported, paid or delivered under this article,'" (*id*. (quoting 72 P.S. § 1301.23(b)) (emphasis omitted)). According to Treasurer, *Coleman v. Workers' Compensation Appeal Board (Indiana Hospital and Phico Services Company)*, 842 A.2d 349, 354 (Pa. 2004), supports the position that Treasurer's examination authority should be construed in accordance with legislative purpose because, in that case, the Pennsylvania Supreme Court acknowledged that, while the standard medical definition of "physical examination" would not include certain tests, the Court held that "employing this rigid clinical definition of 'physical examination' would thwart the purpose of [Section 314(a) of the Workers' Compensation Act, 77 P.S. § 651(a),[9]] by excluding relatively modern diagnostic tools, such as laboratory testing and imaging." (*Id*. at 29-30 (quoting *Coleman*, 842 A.2d at 354).) "Noting that the purpose of the statutorily authorized examination 'is to assess the extent and severity of a claimant's injury[,]' the Court 'interpret[ed] the term "physical examination" to include all reasonable medical procedures and tests necessary to permit a provider to determine the extent of a claimant's disability.'" (*Id*. at 30 (quoting *Coleman*, 842 A.2d at 354).) Treasurer also argues that an interpretation of the relevant statutory provisions that would prevent Treasurer from obtaining relevant documents "in the same electronic format that holders use in their day-to-day operations" so that the records can be submitted to computerized analysis would frustrate the purposes behind DAUPA's

---

[9] Act of June 2, 1915, P.L. 736, *as amended*, 77 P.S. § 651(a).

17

Examination Provision and The Fiscal Code's Examination and Adjustment Provision.  (*Id*. at 31.)


2. Analysis

We begin with the plain language of DAUPA's Examination Provision, which provides in relevant part as follows:

> (b). . . Treasurer, at reasonable times and upon reasonable notice, may **examine** the records of any person or agent thereof to determine whether the person has complied with this article.  The administrator may conduct the **examination** even if the person believes it is not in possession of any property that must be reported, paid or delivered under this article . . . . Treasurer may contract with any other person to conduct the examination on behalf of . . . Treasurer, the selection of whom shall not be questioned.

> (c). . . Treasurer at reasonable times may **examine** the records of an agent, including a dividend disbursing agent or transfer agent, of a business association or financial association that is the holder of property presumed abandoned if the administrator has given the notice required by subsection (b) to both the association or organization and the agent at least 90 days before the **examination**.

72 P.S. § 1301.23(b), (c) (emphasis added).  PPL interprets DAUPA's Examination Provision to authorize Treasurer merely to examine a holder's or agent's records, not to compel the production of records.  Treasurer contends that "examine" is defined to mean "interrogate closely" or "test the condition of," and interrogating or testing large data sets like those involved in unclaimed property investigations requires that Treasurer obtain possession of data in electronic format so that it may use software to analyze it.  Based on our review, the plain language of DAUPA's Examination Provision empowers Treasurer to **examine** PPL's shareholder records, but it does not appear to alone authorize Treasurer to **compel** PPL to produce records

18

in order to facilitate Treasurer's audit. However, The Fiscal Code's Examination and Adjustment Provision authorizes Treasurer

> to **compel the exhibition or delivery** . . . of all official or public books, accounts, documents or papers, which have any relation to or connection with any public account or abandoned and unclaimed account, and which he may deem necessary in the investigation, adjustment or collection of the same . . . .

72 P.S. § 1602(a) (emphasis added). This provision clearly gives Treasurer the **power to compel** the exhibition or delivery of records "[t]o enable . . . Treasurer to examine and revise [public accounts] and abandoned and unclaimed property accounts . . . ." *Id.* As DAUPA's Examination Provision and The Fiscal Code's Examination and Adjustment Provision both relate to Treasurer's examination of unclaimed property records, it is reasonable to construe the provisions together.

The parties, however, disagree about whether it is Treasurer or the unclaimed property holder that may choose whether to exhibit or deliver the requested documents. PPL argues that the disjunctive nature of the language – "exhibition **or** delivery" – suggests it is the unclaimed property holders that may choose the manner of compliance. However, Treasurer contends that it is Treasurer who may choose because the structure of the statutory language focuses on Treasurer as the actor and the act as **Treasurer's** "power to compel the exhibition or delivery to **[Treasurer]** . . . ." 72 P.S. § 1602(a) (emphasis added). Treasurer's interpretation of the statutory language is persuasive, especially because there is no mention in The Fiscal Code's Examination and Adjustment Provision of any powers reserved to unclaimed property holders, and there is no language allowing holders to decide whether to exhibit or deliver their records. Thus, we cannot say at this stage of the proceedings that Treasurer's interpretation is incorrect.

Accordingly, we conclude that Treasurer has stated a claim because it does not appear with certainty that DAUPA's Examination Provision and The Fiscal Code's Examination and Adjustment Provision must be read to preclude Treasurer from compelling the production of PPL's shareholder records.

*B. Whether Treasurer has Failed to State a Claim Because Treasurer is not Authorized to Verify the Accuracy of PPL's Shareholder Records Using Software Analytics.*

1. Parties' Arguments

PPL argues that Treasurer lacks the authority to verify the accuracy of its books and records, as the contents of its records are controlling in an unclaimed property audit. It contends that DAUPA, 72 P.S. § 1301.2(a)(2) (providing, in part, that intangible unclaimed property is subject to the custody and control of the Commonwealth if "the last known address of the owner, as shown by the records of the holder, is within the Commonwealth"), and United States Supreme Court precedent, "establish conclusively that it is the holder's books and records, as they actually appear, that control the first and second priority rights of escheat under Pennsylvania law." (PPL's Br. at 18.) PPL submits that what Treasurer wishes to do – cross-reference PPL's books and records against third-party databases or run PPL's unredacted shareholder data through Kelmar's information technology systems – is not permitted because, under DAUPA, the holder's records control the outcome of the audit, not third-party sources of information. (*Id.* at 21-22.)

Moreover, PPL highlights the fact that it has already made a document production to Treasurer that "fully complie[s] with [Treasurer's] initial August 2017 request for production" and it has also offered Treasurer "access to PPL's unredacted shareholder files for on-site inspection and review . . . ." (*Id.* at 19-20.) Specifically,

PPL explains that it provided Kelmar with a file listing every shareholder with an address in Pennsylvania, whether or not the account was coded as "lost." If the account was coded as "lost," PPL also provided the date the account was so coded and the date of last contact with the shareholder. PPL argues that "[n]o other information is required to determine PPL's compliance with [DAUPA]." (*Id*. at 20 n.10.) PPL maintains that the Subpoena is overbroad because it seeks production of all PPL shareholder information, "regardless of the state or even the country in which the shareholders actually reside." (*Id*. at 20.) PPL thus concludes that Treasurer fails to set forth a claim upon which the Court may grant relief.

Treasurer responds that it is Treasurer who is authorized to independently evaluate the accuracy of a holder's unclaimed property records. Treasurer argues that the "accuracy of a holder's records is relevant to its compliance with its unclaimed property obligations." (Treasurer's Br. at 32.) Treasurer points out that DAUPA recognizes that a holder's report may be inaccurate or incomplete and contends that there exists broad examination authority pursuant to The Fiscal Code's Examination and Adjustment Provision to "examine and revise" unclaimed property accounts as Treasurer. 72 P.S. § 1602(a). According to Treasurer, the cases upon which PPL relies "deal[] with whether an item of property is or is not reportable to a given state," but they do not address "the scope of a state's investigation into compliance with its unclaimed property law" nor do they "hold[] that a holder's records must be accepted as binding in all circumstances . . . ." (Treasurer's Br. at 33 (emphasis omitted).) And, though the "Court need not decide the issue now," Treasurer maintains that PPL is wrong that its records "will be entitled to an [ir]rebuttable presumption of accuracy[]" because "neither DAUPA nor any case provides that [a] holder['s] records govern, for example, where those records are

21

internally inconsistent, contain obvious errors or placeholder addresses, or are intentionally inaccurate." (*Id*. at 34.)

Treasurer discusses several cases that support the contention that Treasurer has broadly construed unclaimed property examination authority. Treasurer again highlights the Delaware Chancery Court's opinion in *AT&T*, a case that concerned a subpoena issued by the Delaware Department of Finance in connection with an unclaimed property examination seeking documents and information regarding rebates and checks issued by AT&T. Treasurer argues that the court's holding that "Delaware's statutory permission to 'examine' unclaimed property records entails the authority to require a holder to query a database and 'provide that information in an electronically usable format[]' is persuasive support that [] Treasurer can direct PPL to produce electronic records that it possesses in" an electronic format. (Treasurer's Br. at 37-38 (quoting *AT&T*, 239 A.3d at 574).) The court in *AT&T* also rejected AT&T's argument that the Delaware State Escheator's authority is limited to obtaining only those documents AT&T believed might reflect escheatable property, recognizing that "determining compliance necessarily includes investigation potential or disputed escheatable property." (*Id*. at 38 (quoting *AT&T*, 239 A.3d at 572).) Moreover, Treasurer points out *Fryzel v. Chicago Title & Trust Co*., 527 N.E. 2d 1025, 1030 (Ill. App. Ct. 1988), wherein the court "rejected a holder's argument that the Director of the Illinois Department of Financial Institutions was entitled to examine only records that the holder believed pertained to reportable property." (Treasurer's Br. at 39.) A California appellate court came to a similar conclusion, notes Treasurer, wherein the "court rejected an insurer's argument that the scope of an unclaimed property examination was limited to property that the insurer thought was reportable[]" and emphasized the state

Controller's authority to "'verify the information in [the holder's] books and records . . . .'" (*Id.* at 40 (quoting *Yee v. Am. Nat'l Ins. Co.*, 185 Cal. Rptr. 3d 363, 370 (Cal. Ct. App. 2015)).) According to Treasurer, federal law, as exemplified in *Marathon Petroleum*, is consistent with *AT&T*, *Fryzel*, and *Yee*. In *Marathon Petroleum*, the Third Circuit stated that United States Supreme Court precedent does not prevent a state from conducting "an appropriate examination to determine if there is fraud or another basis for determining that property may be escheated and conclude[ed] that Delaware [] 'has the authority to dig for information about . . . the true holder of escheatable funds.'" (Treasurer's Br. at 41-42 (quoting *Marathon Petroleum*, 876 F.3d at 501).) Treasurer maintains that these cases demonstrate that PPL may not refuse "to produce unredacted documents because **it believes** those documents do not contain information on assets reportable to Pennsylvania." (*Id.* at 41 (emphasis in original).)

In addition, Treasurer argues that neither DAUPA nor The Fiscal Code's Examination and Adjustment Provision limit how Treasurer may analyze data obtained from a holder. The purpose of those statutes is "to ensure appropriate reporting of unclaimed property and compliance with DAUPA." (*Id.* at 43.) Treasurer argues that compliance requires that Treasurer be able to cross-check holder data to determine whether the data contains errors. Treasurer represents an inability "to identify any authority providing that once a governmental body, or even a private litigant, obtains data through investigative authority or discovery, it cannot run analytics or cross-checks to evaluate the accuracy of that data." (*Id.* at 43-44.)

In its Reply Brief, PPL reiterates that its demurrer should be sustained because Treasurer's Subpoena is overbroad. PPL argues that, while Treasurer relies on *AT&T* and *Yee*, that reliance is misplaced. PPL highlights that the Chancery Court's

holding in *AT&T* fell "decidedly against states' efforts to make sweeping demands of holders in unclaimed property audits." (PPL's Reply Br. at 2-3 (emphasis omitted).) PPL contends that Treasurer quotes dicta from *AT&T*, but what matters is that the court quashed the State's administrative subpoena because it was "not properly scoped" and the court concluded that it would "'sweep in [a] vast amount[] of irrelevant data.'" (*Id*. at 8 (quoting *AT&T*, 239 A.3d at 575).) PPL maintains that, just as in *AT&T*, Treasurer's Subpoena is overbroad because its requests "are not limited by any time period or geography" and because it calls for information about property that is not escheatable at all or not escheatable to Pennsylvania. (*Id*.) Moreover, PPL states that it is perplexed by Treasurer's reliance on *Yee* because, in that case, the appellate court reversed the trial court's entry of a preliminary injunction because "questions about the precise scope of the records examination, how it would proceed, whether the requested records are even reasonably relevant to the unclaimed property inquiry, or whether the production of records requested is impermissibly burdensome had not been adequately addressed." (*Id*. at 8 n.7.) PPL concludes that, because "Pennsylvania has no jurisdiction over the property of citizens of states other than Pennsylvania, the request for electronic production of **all** shareholder data is impermissibly overbroad." (*Id*. at 11 (emphasis in original).)

Moreover, PPL asserts that Treasurer's argument claiming authority to examine and revise unclaimed property accounts, 72 P.S. § 1602(a), would give Treasurer "undefined and potentially limitless authority to perform analytics, cross-checks," and any other tests necessary to evaluate the accuracy of a holder's data and should be rejected. (PPL's Reply Br. at 15.) PPL contends that such an interpretation conflicts with DAUPA, including 72 P.S. § 1301.2(a)(2). In addition, PPL argues that Treasurer's "broad references to investigative authority" must

24

satisfy due process and Fourth Amendment[10] considerations, but Treasurer has made any constitutional analysis impossible because Treasurer has not sufficiently described the testing Treasurer intends to subject to PPL's complete shareholder records. PPL claims that Treasurer has cited no authority granting Treasurer the power to verify a holder's records using software analytics, and, as it previously pointed out, DAUPA and United States Supreme Court precedent establish that it is the holder's books and records themselves that control the outcome of an audit. (*Id.* at 15-16.) Last, PPL maintains that Treasurer's reliance on *Marathon Petroleum* is misplaced because, while the Third Circuit in that case "affirmed 'a state's right to conduct an appropriate examination to determine if there is fraud or another basis for determining that property may be escheated . . . [,]' [it] did not give states *carte blanche* to make unlawful demands." (PPL's Reply Br. at 18-19 (quoting *Marathon Petroleum*, 876 F.3d at 501).) Instead, *Marathon Petroleum* acknowledged that a state's demands could be unlawful in that they could become pretextual or insatiable, which is how PPL describes Treasurer's current requests.

### 2. Analysis

PPL contends that Treasurer may not use software analytics to verify PPL's shareholder data and Treasurer's Subpoena is overbroad, as PPL has already produced to Treasurer all the information necessary to complete its audit. However, the plain language of DAUPA and The Fiscal Code recognizes that a holder's records may not be accurate and thus Treasurer may examine and revise them as necessary. *See* 72 P.S. § 1301.23(a) (stating a holder's report may be inaccurate, false, and/or incomplete). Moreover, The Fiscal Code's Examination and

---

[10] U.S. CONST. AMEND. IV.

25

Adjustment Provision authorizes Treasurer to "examine and revise" unclaimed property accounts. 72 P.S. § 1602(a). These provisions support that Treasurer is authorized to verify the accuracy of a holder's unclaimed property records.

However, DAUPA does not specify the manner in which Treasurer may accomplish such verification. DAUPA does not explicitly permit Treasurer to verify the accuracy of a holder's records using software analytics or by cross-checking data against third-party databases, but it also does not explicitly prevent Treasurer from doing so. PPL's argument that Treasurer lacks the authority to use software analytics to verify the accuracy of its records would, as Treasurer points out, "equally prohibit [] Treasurer . . . from manually comparing PPL's data to information found in a phone book[,]" (Treasurer's Br. at 43 n.22), which begs the question of how, exactly, Treasurer can "examine and revise" unclaimed property accounts without cross-checking a holder's data against third-party sources.

PPL argues that the Subpoena is overbroad, as it has already produced to Treasurer all the information necessary to complete Treasurer's audit. PPL contends that, under federal common law, a holder's records control the outcome of an audit, and, as a result, unclaimed property administrators have narrow room to examine a holder's records. Here, PPL maintains that Treasurer's data requests contemplate a breadth of examination authority that is contrary to United States Supreme Court precedent. However, the Third Circuit's decision in *Marathon Petroleum* supports that Treasurer would not, in this case, be prevented under federal common law from conducting an examination that includes PPL's shareholders' PII.

In *Marathon Petroleum*, two Delaware business entities, Marathon Petroleum Corporation and Speedway LLC (together, the Companies) challenged Delaware's right to conduct an audit examining whether certain funds paid for stored-value gift

26

cards issued by the Companies' Ohio-based subsidiaries (Ohio Subsidiaries) were held by the Companies and thus subject to escheatment. Kelmar, who was working on behalf of Delaware's State Escheator, requested from the Companies extensive detailed information about the Ohio Subsidiaries. *Marathon Petroleum*, 876 F.3d at 487. The Companies argued that, because the Ohio Subsidiaries were not Delaware entities, Delaware lacked authority to escheat any sums associated with the unredeemed gift cards. *Id*. Therefore, the Companies refused to produce any documentation beyond what they believed proved that the Ohio Subsidiaries were incorporated in Ohio and had no property in Delaware. *Id*. After Kelmar notified the Companies that it would refer the matter to the Delaware Attorney General's Office to consider an enforcement action if the Companies continued to withhold information, the Companies filed a complaint seeking declaratory and injunctive relief. *Id*. The Companies argued, *inter alia*, that, "under the rules of priority and preemption laid down by the [United States] Supreme Court, Delaware [wa]s not permitted to escheat the gift-card money" and was also "barred from auditing [the Companies] in connection with the gift cards." *Id*. at 484. The Third Circuit characterized the Companies' position as follows: "Delaware must take [the Companies] at their word and cannot inquire into their books and records to see if the property belongs to them or the Ohio Subsidiaries." *Id*. at 499.

However, the Third Circuit disagreed with the Companies, concluding that *Texas v. New Jersey*, 379 U.S. 674 (1965), and its progeny "do not prevent Delaware from examining books and records to determine the true holder of abandoned property." *Marathon Petroleum*, 876 F.3d at 499. The court went on to state that the "*Texas* trilogy"[11] does not foreclose a state from "conduct[ing] an appropriate

---

[11] The court was referring to *Texas*, *Pennsylvania v. New York*, 407 U.S. 206 (1972), and *Delaware v. New York*, 507 U.S. 490 (1993).

examination to determine if there is fraud or another basis for determining that property may be escheated," but acknowledged that "a state's demands for information may become so obviously pretextual or insatiable, and the record so clearly developed," that the state's audit process must be curtailed. *Id*. at 501. Here, by producing what it has deemed sufficient but no more, PPL is proceeding much like the Companies did in *Marathon Petroleum*. However, under *Marathon Petroleum*, United States Supreme Court precedent does not preclude a state from examining a holder's unclaimed property records in order to verify their accuracy, so long as the state's information requests do not appear to be obviously pretextual or insatiable. We are here on preliminary objections, and, based on the allegations contained in the Complaint, which we must accept as true, Treasurer's information requests do not appear obviously pretextual or accurately described as insatiable.

Accordingly, Treasurer has stated a claim because it does not appear with certainty that Treasurer is not authorized to verify the accuracy of PPL's records.

### C. Whether Treasurer has Failed to State a Claim Because Treasurer may not Compel PPL to Produce its Shareholders' PII.

#### 1. Parties' Arguments

PPL takes the position that, not only is the Subpoena overbroad, but it is also overly burdensome, as disclosing its shareholders' PII exposes those shareholders to needless risk. PPL cites several cases and article I, section 8 of the Pennsylvania Constitution,[12] which, according to PPL, "underscore the centrality of privacy of an

---

[12] Article I, section 8 of the Pennsylvania Constitution provides:

The people shall be secure in their persons, houses, papers and possessions from unreasonable searches and seizures, and no warrant to search any place or to seize any person or things shall issue without describing them as nearly as may be, nor

**(Footnote continued on next page…)**

28

individual's financial records and information in Pennsylvania's jurisprudence." (PPL's Br. at 24.) PPL asserts that the Complaint fails to explain why this Court should disregard the privacy interests of PPL's shareholders. PPL explains that it objects to providing an unredacted electronic production to Kelmar that includes all of its shareholders' PII because "Kelmar is simultaneously conducting unclaimed property audits of PPL on behalf of [24] other states, [and] its shareholders' information may immediately become a 'public record' subject to [Freedom of Information Act[13]]-type disclosure requests in several of those states." (*Id*. at 26.) While Treasurer has agreed to direct Kelmar not to share such records with any such state, (Complaint ¶ 29(c) n.1), PPL submits that "[i]t remains a legitimate and unresolved question of law as to whether PPL's compelled production to Kelmar of electronic records of shareholders' PII subjects the shareholders' protected PII to disclosure under public records laws in the other states represented by Kelmar – regardless of any instruction [] Treasurer may provide to Kelmar." (PPL's Br. at 28.)

Treasurer responds that PPL's averred concern about privacy is "one of convenience, not conviction" because it has routinely shared the requested electronic records with other parties. (Treasurer's Br. at 45.) However, keeping to the allegations of the Complaint, Treasurer notes that neither Treasurer's office nor Kelmar have ever suffered a data breach, (*id.* (citing Complaint ¶ 29(c))), and that Kelmar's security protocols are strong, (*id.* (citing Complaint Ex. 3(C) at 4)). Treasurer explains that Kelmar's information security frameworks "reflect current

---

without probable cause, supported by oath or affirmation subscribed to by the affiant.

PA. CONST. art. I, § 8.

[13] 5 U.S.C. § 552 (2016).

industry standards, and it is likely that PPL and similarly situated firms already use these exact same frameworks today to secure their own systems." (*Id*. at 46.)

In addition, Treasurer points out that neither DAUPA nor The Fiscal Code more generally express concern about data security and "nowhere provide that a holder may legitimately refuse to comply with [] Treasurer's request because of a purported concern[] about the confidentiality of the data to be provided." (*Id*. at 47.) To the contrary, the General Assembly straightforwardly dealt with confidential information issues by exempting unclaimed property records from public disclosure. (*Id*. at 48 (citing 72 P.S. § 1301.23(d)).) Treasurer also observes that unclaimed property belongs to someone other than the holder being examined, and, therefore, every unclaimed property audit necessarily involves an examination of records of persons other than the holder of those records. PPL's privacy contentions, if accepted, would thus invite widespread "judicial entanglement" in the unclaimed property examination process. (*Id*.) In response to the concern that PPL's shareholders' PII would be exposed to other states in which that information would be subject to open record laws, Treasurer points out the averment in its Complaint that Treasurer "'agreed to direct Kelmar not to share such records with any' state that deems them public records." (*Id*. n.27 (quoting Complaint ¶ 29(c) n.1).) Treasurer also raises two other points. First, Treasurer points out that DAUPA provides that records obtained during an examination may be "disclosed to the abandoned property office of another state for that state's use in circumstances equivalent to those described in this subdivision **if the other state is bound to keep the documents and papers confidential**." (*Id*. (quoting 72 P.S. § 1301.23(d)(4)) (emphasis in original).) Second, Treasurer notes that in *Department of Finance v. Univar, Inc.* (Del. Ch., No. CV 2018-0884-JRS, filed May 21, 2020), slip op. at __,

2020 WL 2569703, at *4, the court held that "Kelmar is bound by Delaware law not to share any of Univar's confidential information" and noted that the court could order that any records produced under the subpoena be kept confidential. (*Id.*)

In its Reply Brief, PPL claims that Treasurer has not adequately addressed its concerns about shareholder privacy and information security. It claims that Treasurer's "blithe dismissal" of these concerns "does not reconcile DAUPA's public records protections with the open records laws of other states that Kelmar is simultaneously serving in this multi-state audit." (PPL's Reply Br. at 12.) According to PPL, Treasurer's agreement to direct Kelmar not to share PPL's shareholders' PII "embeds a legal conclusion and logical leap that is not entitled to any presumption of truth or correctness at this stage of the proceeding . . . ." (*Id.*) PPL submits that if it discloses its shareholders' PII to Kelmar, then the "records are conceivably within the possession, custody, or control of the [24] other states participating in the multi-state audit[,]" potentially exposing the records to public disclosure. (*Id.* at 13.) PPL notes that Treasurer's "reliance on and characterization of" *Univar* is inaccurate, as the court in its May 21, 2020 opinion did not formally rule on Univar's confidentiality concerns.

## 2. Analysis

PPL expresses concern that disclosure of its shareholders' PII to Treasurer would risk compromising that data because particular states in Kelmar's multi-state audit of PPL do not exempt from public records requests for unclaimed property records. Based on our review, it does not appear that DAUPA exempts PII from the scope of Treasurer's examination. Holders of unclaimed property must report to Treasurer the following:

31

(1) . . . [T]he name, if known, and last known address, if any, of each person appearing from the records of the holder to be the owner of any property of the value of fifty dollars ($50) or more;

(2) The nature and identifying number, if any, or description of the property and the amount appearing from the records to be due[] . . . ; and

(3) The date when the property became payable, demandable, returnable or the date upon which the property was declared or found to be without a rightful or lawful owner, and the date of the last transaction with the owner with respect to the property . . . .

72 P.S. § 1301.11(b)(1)-(3). If a holder fails to report this information to Treasurer, then Treasurer may seek to obtain it pursuant to The Fiscal Code's Examination and Adjustment Provision. PPL represents that it provided Kelmar with a file listing every shareholder with a Pennsylvania address. For shareholder accounts bearing a "lost" code, PPL also provided the date the account was so coded and the date of last contact with the shareholder. (PPL's Br. at 20 n.10.) Treasurer avers that PPL's production: (1) did not include identifying information including names, account numbers, or addresses for any shareholders, and (2) included no information with respect to shareholders that, according to PPL, are associated with addresses in states other than those participating in the examination. (Complaint ¶¶ 20-21.) Based on Treasurer's averments, which we must accept as true in ruling on PPL's Revised Preliminary Objections, *Neely*, 838 A.2d at 19 n.4, there is reason to believe that PPL has failed to satisfy DAUPA's reporting requirements, and thus Treasurer may be authorized to compel the electronic production of that information.[14]

---

[14] We note that this Court is capable of fashioning a confidentiality order that would ensure that Kelmar complies with Pennsylvania law. *See, e.g.*, *Univar*, slip op. at __, 2020 WL 2569703, at *4 ("This [c]ourt has the authority, backed by its inherent contempt powers, to order that any books and records Univar produces in response to the subpoena be subject to a confidentiality **(Footnote continued on next page…)**

Accordingly, Treasurer has stated a claim because it does not appear with certainty that Treasurer is precluded from compelling PPL to produce its shareholders' PII.

## V. Conclusion

Based on the foregoing, we cannot say with certainty, at this early stage, that the law does not entitle Treasurer to the injunctive and declaratory relief sought. Accordingly, we must overrule PPL's Revised Preliminary Objections and order PPL to answer the Complaint.

_____
**RENÉE COHN JUBELIRER**, Judge

President Judge Brobson did not participate in the decision in this case.

---

order that complies with (and imposes) Delaware law. Such an order could include, for example, a provision prohibiting the Kelmar auditors who receive Univar's information . . . from sharing that information with others, including other Kelmar auditors.").

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

| | | |
|---|---|---|
| Joseph M. Torsella, in his official capacity as the Treasurer of the Commonwealth, | : : : | |
| Plaintiff | : : | |
| v. | : | No. 272 M.D. 2019 |
| | : | |
| PPL Corporation, | : | |
| Defendant | : : | |

## **O R D E R**

**NOW**, July 20, 2021, in accordance with the foregoing opinion, PPL Corporation's Revised Preliminary Objections in the nature of a demurrer are **OVERRULED**. PPL Corporation is ordered to file an answer within 30 days of this Order.

_____
**RENÉE COHN JUBELIRER,** Judge